Ralph PENN, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Albert PENN, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 13689, 13702.

United States Court of Appeals, Ninth Circuit.

Jan. 15, 1955.

Will Freeman, Norman Lettvin, Chicago, Ill., for petitioner.

H. Brian Holland, Asst. Atty. Gen., Harry Marselli, Ellis N. Slack, George F. Lynch, Sp. Assts. to Atty. Gen., Charles W. Davis, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent.

Before FEE and CHAMBERS, Circuit Judges, and WALSH, District Judge.

JAMES ALGER FEE, Circuit Judge.

These consolidated proceedings involve deficiencies in gift taxes determined for 1946 against petitioner Albert Penn and for 1946 and 1947 against petitioner Ralph Penn. During these years, the taxpayers each made gifts of shares of Penn Electric Switch Company common stock and reported the values thereof per share on their respective gift tax returns for those years. The Commissioner determined that the fair market value of the above mentioned common stock was $20.00 per share on each of the respective dates of the gifts thereof, and issued notices of deficiency based on that determination. Trial was held before the Tax Court at which a stipulation of facts was introduced, which is here epitomized.

The Penn Electric Switch Company, hereinafter referred to as "Switch Company," was an Iowa corporation with principal offices at Goshen, Indiana, in-corporated in July, 1928, to take over the assets and business of a co-partnership of the same name. During the taxable years and for many years prior thereto, Albert Penn was president and chairman of the board of directors and Ralph Penn was vice-president and treasurer and a director of that company. At all times, Switch Company has kept its books and records and filed its tax returns on a calendar year accrual basis of accounting. During the years material here, Switch Company engaged in the business of manufacturing and selling automatic electric controls for various types of heating equipment, commercial refrigeration, air-conditioning equipment, pumps, air compressors and engines.

During 1946–7 the capital stock of Switch Company was divided into Class A and Common. Class A was originally sold to the public at $20.75 per share in 1936 through a Chicago brokerage firm, and during the taxable years and before was listed on the exchange. In 1940–6 Switch Company paid dividends on Class A stock and in certain of those years on common. The common was never listed on any exchange and was held by about thirty stockholders at the times here involved. The bulk of common was held in about equal proportions by Albert Penn and his immediate family and Ralph Penn and his immediate family. Approximately 16,000 shares, constituting the balance of common, were held largely by directors, officers and employees of the company. There were no sales of common in 1945–6, but in three different months after January, 1947, a total of 815 shares was sold at a price of $10.00 per share to persons then or theretofore connected with the company as legal counsel, officer or employee.

For the indicated calendar years the book value of Switch Company's outstanding common stock at the beginning of each year, after giving effect to the redemption value of 50,000 shares of Class A stock of $25.00 per share, was as follows:

| Year | Book Value of Common |
|------|---------------------|
| 1941 | $236,472.00 |
| 1942 | 444,798.00 |
| 1943 | 692,655.00 |
| 1944 | 350,807.00 |
| 1945 | 409,537.00 |
| 1946 | 405,540.00 |

During the years 1941 to 1946, inclusive, Switch Company followed a policy of paying unusually high salaries to its executives. The percentage of such salaries to the company net profits, after taxes, for each of those years, was as follows: 43 per cent for 1941, 86 per cent for 1942, 81 per cent for 1943, 92 per cent for 1944, 103 per cent for 1945, and 29 per cent for 1946.

For the indicated calendar years, Switch Company's net profit per share on common after Class A dividends was as follows:

| Year | Profit per Share on Common |
|------|---------------------------|
| 1941 | $1.92 |
| 1942 | 1.22 |
| 1943 | 1.59 |
| 1944 | 1.34 |
| 1945 | 1.12 |
| 1946 | 4.45 |

While, for our purposes, the profit per share itself for the year is the interesting factor, the tabulation in evidence includes figures for each of these years on net sales, gross profit on sales and net profit after federal income taxes, which have been here omitted although incidently reflected by the figures given.

For the period of twenty weeks ending May 18, 1947, Switch Company had net sales amounting to $3,597,107.00; gross profit on sales amounting to $997,255.00; and net profit of $336,231.00 after provision for federal income taxes.

On its outstanding 100,000 shares of $5.00 par value common stock, Switch Company paid dividends amounting to $100,000.00 in 1940; none in 1941; $50,000.00 in each of the years 1942, 1943 and 1944; and none in 1945 and 1946.

The board of directors felt the need for more working capital. This was finally obtained by two devices noted hereafter, but the agreements whereby additional working funds were received each contained almost prohibitive restrictions upon the payment of any dividends at all. The two methods were, first, the negotiation by Switch in December, 1945, of a revolving credit agreement and, second, the obtaining of a loan of $1,000,000.00. Each of these factors was considered in establishing the market value of the common stock.

During the trial before the Tax Court, three experts testified as to the value of the Switch common stock, two for the petitioners and one for the Commissioner.

Based upon the record, the court found that the fair market value of Switch Company common stock was $14.00 per share on July 27, 1946, and $16.00 per share on December 2, 1946, and May 22, 1947.

■■ The appeal in each instance is founded upon this finding. The matter is pure fact. The court had heard the evidence, considered the stipulated facts and exhibits and arrived at the value. There is no question upon which all persons, reasonable or otherwise, are so apt to differ as upon a question of value. It makes little difference whether the facts agreed upon or stipulated are in writing or by oral testimony. The duty of finding the facts is placed upon that court. When found, such facts are binding upon the appellate courts.

■ This is far from saying that the appellate court should refuse to recognize its responsibility to set aside a finding which is "clearly erroneous," especially when a firm conviction is arrived at that, considering the whole record, a mistake has been committed. But the appellate court should never make the error of substituting its own judgment of the record as a whole for that of the findings of the tribunal primarily charged with the responsibility. It is a subtle difference, but a real one.

Of course, questions of law the appellate courts consider independently. Here they must be first determined. Appellants concede that the Tax Court correctly stated the rule as to the factors to be considered in evaluation. These included "book value" as one of the ponderables.

After they have stated that the elements taken into consideration by the Tax Court were proper and have recognized the rule that one element alone should never be considered as determinative, petitioners attempt to state a rule that book value is absolutely controlling in the valuation of closely held stock. They then claim that the decided cases hold that the fair market value of shares of stock representing a minority interest in such a corporation must be less than the book value of the stock. There is a short answer to this. There is no such rule of law. The question is one of fact to be decided in every case taking into consideration all the elements. The tendency to construct a rule of law out of states of fact which have been approved by some trial court is very strong. Even where the appellate court simply holds that none of the findings of the trial court are clearly erroneous, the cases are cited as though the fact pattern exemplified would be conclusive in any analogous case.

The petitioners set up claimed errors in the opinion of the Tax Court. Essentially these are textual criticisms of the language used. We shall not discuss them in detail because each deals with a matter of factual approach.

■■ It is said that the Tax Court incorporated errors of approach made by the expert for the government, notwithstanding some other court in some other case rejected the conclusions of this witness. Furthermore, the court said expert witnesses for petitioner reflected lack of acquaintance with the facts in this particular case. But a specific admission was made by each of them to that effect. The objection that the Tax Court rejected the opinion of experts called by petitioners is of no avail. The witnesses were before the Tax Court and are not here. No valuation by any expert witness was binding on that court or on this. The questions of the management of the company, the amount of the executive salaries, general stock market conditions, the sales of stocks of other concerns and all other elements were for solution by that court. There was no need to state the process by which valuation was attained except to make clear that all appropriate factors required by law to be taken into consideration were in fact weighed. As has been seen, that court stated the rule admirably and correctly. If improper weight may have been given to these elements of evaluation but the conclusion was not demonstrably wrong, an appellate court should not interfere. Congress has committed questions such as valuation to the Tax Court. This Court claims no competency in evaluation of stock or in the field of corporate accounting.

The trial court correctly stated the law, which is within the area of our expertness.

Affirmed.