Monte J. WALLACE, Anne H. Wallace, Neil W. Wallace, and Elise R. Wallace, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–4088–K.

United States District Court, D. Massachusetts.

Dec. 18, 1981.

M. Gordon Ehrlich, John S. Brown, Bingham, Dana & Gould, Paul Lambert, Boston, Mass., for plaintiffs.

Ralph A. Child, Asst. U.S. Atty., Boston, Mass., Steven Z. Kaplan, Michael E. Weitzner, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

Opinion

KEETON, District Judge:

This is an action brought pursuant to 26 U.S.C. § 7402 for the recovery of gift taxes paid by plaintiffs on gifts made in October and November 1972. The court has jurisdiction under 28 U.S.C. § 1346(a)(1). At

issue is the value of gifts of stock made by plaintiffs to two trusts established for their respective children.

Findings of fact (based on evidence presented during a five-day bench trial) and conclusions of law are set forth in narrative form in this opinion.

## I. Background Facts

Plaintiffs are two brothers, Monte J. and Neil W. Wallace, and their respective spouses, Anne H. and Elise R. Wallace. On October 16, 1972, Monte and Neil Wallace each[1] made gifts of 120 shares of W Corporation ("W Corp") Class B common stock and 300 shares of General Investment and Development Co. ("GID") Class B common stock to trusts established in 1972 for their respective children ("1972 Monte Wallace Trust" and "1972 Neil Wallace Trust").[2] On November 1, 1972, each made gifts of an additional 54 shares of W Corp Class B common stock to the same donees.

Plaintiffs filed timely gift tax returns. In valuing the gifts on the returns, plaintiffs relied upon appraisals of the W Corp and GID shares prepared by Management Planning, Inc. ("MPI") at plaintiffs' request. *See* part VII, *infra.* MPI valued each 120-share block of W Corp Class B Common at $500,000 ($4,167 per share) and each 300-share block of GID Class B Common at $328,500 ($1,095 per share) on October 16, 1972. MPI valued each 54-share block of W Corp Class B Common at $237,300 ($4,395 per share) on November 1, 1972. Plaintiffs claim that a correct valuation for all the stock donated by each of the brothers would have been no more than $27,791, an amount less than the specific exemptions to which each of the brothers and his spouse were entitled.

On February 13, 1973, Monte and Neil Wallace each paid $110,118.94 in gift taxes. The same day payments of $110,040.18 were made on behalf of Anne and Elise Wallace for gift taxes on the gifts of W Corp and GID stock made by their respective husbands. The total amount paid with respect to the gifts at issue was $440,318.24.[3]

On February 6, 1976, plaintiffs each submitted a timely claim for refund of the entire amount of gift tax on the gifts at issue, plus interest, claiming that the appraisals on which they relied in reporting the gifts excessively valued the donated shares. The Internal Revenue Service disallowed their claims on August 23, 1976.

## II. Capitalization and Gifts

### A. W Corp

At all times relevant to this litigation, W Corp was a family held investment corporation, which plaintiffs describe as "a closed-end non-diversified unregulated investment company." Before October 16, 1972, the capitalization of W Corp consisted of 1000 shares of common stock. Monte and Neil Wallace each owned 290 shares of common stock. The remaining 420 shares were held in six trusts ("the 1968 trusts") for the benefit of various Wallace children. Each trust owned 70 shares.

Pursuant to an estate plan prepared by plaintiffs' tax counsel, W Corp underwent a recapitalization on October 16, 1972, immediately before the gifts at issue were made; 85% of the W Corp common stock was exchanged on a pro rata basis for 508,890 shares of non-voting 6% noncumulative convertible preferred stock ("Preferred") without par value. The Preferred had a stated liquidation value of $100 per share. It was outstanding in an amount such that its aggregate stated liquidation value equaled 85% of the value of W Corp's previously outstanding common shares, as determined in an appraisal prepared by MPI. The preferred shares carried a noncumulative an-

---

1. Plaintiffs Anne H. Wallace and Elise R. Wallace each consented to being treated as if they had made one-half of the gifts.

2. Each of the 1972 Trusts had two trustees. Monte Wallace and another were the trustees of the 1972 Neil Wallace Trust. Neil Wallace and another were the trustees of the 1972 Monte Wallace Trust.

3. The Internal Revenue Service (IRS) audited Monte Wallace's gift tax return in 1974. The IRS closed its audit without asserting a deficiency.

nual dividend rate of 6% of the stated liquidation value. They were not callable.

The remaining 15% of the W Corp common stock was exchanged, on a pro rata basis, for 600 shares of Class A voting common stock ("Class A Common"), and 600 shares of Class B nonvoting common stock ("Class B Common"). The Class A Common and Class B Common stocks were outstanding in equal amounts and were equal in all respects except that only Class A Common shares carried the power to vote.

Each preferred share was convertible, at any time, at the option of the preferred shareholder into the number of Class B Common shares equal in value to the liquidation value of the Preferred stock ("the conversion ratio"). At the time of the proposed conversion, the conversion ratio was to be determined by an independent appraisal which would value the Class B Common shares to be issued in exchange for the Preferred stock.

After the recapitalization Monte and Neil Wallace each owned 147,578 shares of Preferred, 174 shares of Class A Common, and 174 shares of Class B Common. Together, the 1968 Trusts owned 213,754 shares of Preferred, 252 shares of Class A Common, and 252 shares of Class B Common.

As stated above, on October 16, 1972 Monte and Neil Wallace each gave 120 shares of Class B Common to the trusts established for their respective children, and on November 1, 1972, Monte and Neil Wallace each gave an additional 54 shares of Class B Common to the same trusts.

The ownership of W Corp is summarized in Table 1.

### Table 1
#### Before Gifts

| Shareholder | | Before Recapitalization | After Recapitalization | | |
|---|---|---|---|---|---|
| | | Common Stock | Pre-ferred | Class A | Class B |
| Monte Wallace | (29%) | 290 | 147,578 | 174 | 174 |
| Neil Wallace | (29%) | 290 | 147,578 | 174 | 174 |
| 1968 Trusts | (42%) | 420 | 213,734 | 252 | 252 |
| | (100%) | 1,000 | 508,890 | 600 | 600 |

#### After Gifts

| Shareholder | Preferred | Class A | Class B |
|---|---|---|---|
| Monte Wallace | 122,578 (24%) | 174 (29%) | 0 |
| Neil Wallace | 122,578 (24%) | 174 (29%) | 0 |
| 1968 Trusts | 213,734 (42%) | 252 (42%) | 252 (42%) |
| 1972 Monte Wallace Trust | 0 | 0 | 174 (29%) |
| 1972 Neil Wallace Trust | 0 | 0 | 174 (29%) |
| Corporate Treasury [4] | 50,000 (10%) | — — | — — |
| | 508,890 (100%) | 600 (100%) | 600 (100%) |

---

**B. GID**

At all times relevant to this litigation, GID was a Massachusetts business trust engaged in the business of owning and operating certain rental properties.

---

4. On October 30, 1972, W Corp redeemed 50,-000 shares of Preferred stock, 25,000 each from Monte and Neil Wallace, at their liquidation value of $100 per share. In exchange for their shares, the Wallaces received W Corp's 6% promissory note which was payable over five years, the first payment of $100,000 was due in 1976, and the remaining balance in 1977.

Before October 16, 1972, the capitalization of GID consisted solely of 9,910 shares of common stock, which were held in equal amounts by Monte and Neil Wallace. Pursuant to the estate plan referred to above, GID underwent a recapitalization on October 16, 1972, which was substantially similar to that undergone by W Corp. The shareholders exchanged 85% of their common stock for 137,190 shares of non-voting, no par, convertible preferred stock ("GID Preferred").

The GID Preferred had a stated liquidation value of $100 per share. It was outstanding in an amount such that its aggregate stated liquidation value equaled 85% of the value of GID's previously outstanding shares as determined in an appraisal performed by MPI. The GID Preferred shares had a noncumulative dividend rate of 6% of stated liquidation value and were not callable.

The remaining 15% of GID's common stock was exchanged for 600 shares of Class A voting common stock ("GID Class A Common") and 600 shares of Class B non-voting common stock ("GID Class B Common"). Each GID Preferred share was convertible at any time, at the option of the preferred shareholder, into the amount of non-voting Class B Common shares equal in value to the liquidation rate of the preferred stock ("conversion ratio"). The conversion ratio was to be determined at the time of the proposed conversion by an independent appraisal which would value the GID Class B Common shares to be issued in exchange for the GID Preferred stock.

After the recapitalization Monte and Neil Wallace each owned 68,595 shares of GID Preferred stock, 300 shares of GID Class A Common, and 300 shares of GID Class B Common. On October 16, 1972, Monte and Neil Wallace each made gifts of 300 shares of GID Class B Common to the trusts established in 1972 for their respective children.

The ownership of GID is summarized in Table 2.

### Table 2
#### Before Gifts

| Shareholder | | Before Recapitalization | After Recapitalization | | |
|---|---|---|---|---|---|
| | | Common Stock | Preferred | Class A | Class B |
| Monte Wallace | (50%) | 4,955 | 68,595 | 300 | 300 |
| Neil Wallace | (50%) | 4,955 | 68,595 | 300 | 300 |
| | (100%) | 9,910 | 137,190 | 600 | 600 |

#### After Gifts

| Shareholder | Preferred | Class A | Class B |
|---|---|---|---|
| Monte Wallace | 68,595 (50%) | 300 (50%) | 0 |
| Neil Wallace | 68,595 (50%) | 300 (50%) | 0 |
| 1972 Monte Wallace Trust | | | 300 (50%) |
| 1972 Neil Wallace Trust | | | 300 (50%) |
| | 137,190 (100%) | 600 (100%) | 600 (100%) |

### III. Assets and Liabilities

The parties agree that on the dates of the gifts at issue assets and liabilities of the corporations were as follows:

*W Corp Assets:*

1. 7,842,019 shares of Continental Investment Corporation (CIC), the value of which is in dispute. See VIII–A, *infra.*

2. 17,400 shares of Continental Mortgage Investors (CMI), valued at $12.9375, amounting to $225,112.50, rounded to $225,000.

3. 24% interest in Continental Advisers, valued at $6,403,200 not discounted (the applicability of a discount for lack of marketability being disputed). See VIII–B, *infra*.

4. Other assets valued at $5,325,000.

*W Corp Liabilities:*

1. Long-term debts of $2,465,000.

2. Other liabilities of $9,200,000.

*GID Assets:*

1. Real estate operations valued at $22,643,000.

2. Notes receivable from Affiliate valued at $1,086,000.

3. Notes re: Waltham and Beverly valued at $2,594,000.

4. 331,660 shares of CMI valued at $12.9375 per share, amounting to $4,291,000.

5. 56% interest in Continental Advisers, valued at $14,940,000 not discounted (the applicability of a discount for lack of marketability being disputed). See VIII–B, *infra*.

6. 80% interest in Continental Advisers, Inc. (CAI), valued at $264,960 not discounted (the applicability of a discount for lack of marketability being disputed). See VIII–B, *infra*.

*GID Liabilities:*

1. Long-Term debts of $24,736,000.

*Continental Investment Corporation (CIC)*

CIC was a Massachusetts corporation that owned the following subsidiaries, having the functions listed:

| Subsidiary | Function |
| --- | --- |
| a. Investors Mortgage Insurance Co. | Mortgage insurance |
| b. John P. Chase, Inc. | Investment counsel<br>Mutual funds management |
| c. Waddell & Reed, Inc. | Mutual funds management and distribution |
|   i. United Investors Life Insurance Co. | Domestic life insurance |
|   ii. United Funds Management, Ltd. | Mutual funds management – Canada |
|     A. United Investment Life Assurance Co. | Life insurance – Canada |
|     B. United Investment Services | Mutual funds distribution – Canada |
|   iii. Kansas City Securities Corp. | Domestic brokerage |
|   iv. Toronto Securities Co. | Brokerage – Canada |
| d. Diversified Advisers, Inc. | Adviser to Diversified Mortgage Investors (REIT) |
| e. American Lakes & Land Co., Inc. | Leisure home development and sales |

On the valuation dates, CIC had 12,818,920 shares of $1 par value common stock outstanding, of which 61.2% was owned by W Corp. and an additional 5% of which was owned by officers and/or directors of CIC.

*Continental Advisers*

W Corp owned a 24% interest and GID owned a 56% interest in Continental Advisers, which was a partnership that acted as an investment adviser to CMI. The parties agree that a 9.2 multiplier should be applied to Continental Advisers' 1972 earnings of $2,890,000, rather than the 13.0 multiplier used by MPI. The parties do not dispute a figure of $6,403,200 for W Corp's 24% interest and $14,940,000 for GID's 56% interest. The parties disagree about whether a discount for lack of marketability should be applied. See VIII–B, *infra*.

*Continental Advisers, Inc. (CAI)*

This corporation carried on the business of Continental Advisers in California. The parties agree that Continental Advisers, Inc. had earnings in 1972 of $36,000 and that a 9.2 earnings multiplier (rather than the 13.0 multiplier used by MPI) should be

applied. They agree that GID's 80% interest in CAI is valued at $264,960, but disagree about whether a discount for lack of marketability should be applied. *See* VIII–B, *infra.*

### IV. Relevant Statutes and Regulations

Section 2512(a) of the Internal Revenue Code, 26 U.S.C. § 2512(a), provides:

If the gift is made in property, the value thereof on the date of the gift shall be considered the amount of the gift.

**5.** § 25.2512–1 Valuation of property in general

Section 2512 provides that if a gift is made in property, its value at the date of the gift shall be considered the amount of the gift. *The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. The value of a particular form of property is not the price that a forced sale of the property would produce.* Nor is the fair market value of an item of property the sale price in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate.... The value is generally to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the property. For example, in the case of shares of stocks or bonds, such unit of property is generally a share or a bond. Property shall not be returned at the value at which it is assessed for local tax purposes unless that value represents the fair market value thereof on the date of the gift. *All relevant facts and elements of value as of the time of the gift shall be considered.* Where the subject of a gift is an interest in a business, the value of items of property in the inventory of the business generally should be reflected in the value of the business.
(Emphasis added.)

**6.** § 25.2512–2 Stocks and bonds

(a) In general. The value of stocks and bonds is the fair market value per share or bond on the date of the gift.

\* \* \* \* \* \*

(e) Where selling prices or bid and asked prices do not represent fair market value. In cases in which it is established that the value per bond or share of any security determined on the basis of the selling or bid and asked prices ... does not represent the fair market value thereof, then some reasonable modification of the value determined on that basis or other relevant facts and elements of value

Relevant regulations appear in 26 C.F.R. § 25.2512 *et seq.* Section 25.2512–1 [5] declares that "value" is determined by the willing-buyer-willing-seller standard of valuation. This section also states the principles, among others, that the value of a property is not its "forced sale" price and that, "All relevant facts and elements of value as of the time of the gift shall be considered." Section 25.2512–2 [6] provides for applying the standard to stocks and

shall be considered in determining fair market value.... If the donor can show that the block of stock to be valued, with reference to each separate gift, is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. Complete data in support of any allowance claimed due to the size of the block of stock being valued should be submitted with the return. On the other hand, if the block of stock to be valued represents a controlling interest, either actual or effective, in a going business, the price at which other lots change hands may have little relation to its true value.

(f) Where selling prices or bid and asked prices are unavailable. If ... actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration:

(1) In the case of corporate or other bonds, the soundness of the security, the interest yield, the date of maturity, and other relevant factors; and

(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.

Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: The goodwill of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. *However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case.* Complete financial and other data upon which the valuation is based

bonds; it identifies many relevant factors and provides, however, that the weight to be accorded to them and to any other evidentiary factors depends upon the facts of each case. Section 25.2512–3 [7] provides for applying the standard to valuation of interests in business, and directs that care be taken to arrive at an accurate valuation of any interest in a business that the donor transfers as a gift.

## V. The Nature of the Valuation Issue

■ At issue is the value of the Class B Common Shares of W Corp and GID given to the 1972 Trusts by plaintiffs. Because this is an action for a tax refund, the burden of proving that these shares were overvalued on the gift tax return (and that therefore there was an overpayment) is on the taxpayer. *See, e.g., Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932).

Each of the parties contends that its expert testimony faithfully applies the willing-buyer-willing-seller standard of valuation prescribed and elaborated in 26 C.F.R. §§ 25.2512 *et seq.* and that the opponent's expert testimony departs from or misapplies that standard. I conclude that each party is correct in finding the other's arguments for a particular formula flawed. Any argument in this case that the court must, or an expert witness must, adopt one formula or another, and then calculate the value of the donated stock, deviates from the willing-buyer-willing-seller standard. *See Silverman v. Commissioner of Internal Revenue,* 538 F.2d 927, 933 (2d Cir.1976).

■ It is true that precise rules of law have been adopted for some recurring types of issues. *See, e.g., Estate of Bright v. United States,* 658 F.2d 999 (5th Cir.1981) (one-half interest of deceased wife in 55% block of stock held as community property valued for estate tax purposes as 27½% interest, not as ½ of controlling 55% interest). In general, however, controversies over valuation are not governed by fixed rules. Thus, a case cannot be decided by selecting some formula as the only correct one, then determining figures to be used in each step of the formula and proceeding through mathematical calculation to the foreordained result. Instead, valuation of stock for tax purposes under the willing-buyer-willing-seller standard "is ever one of fact and not of formula." *Hamm v. Commissioner of Internal Revenue,* 325 F.2d 934, 937–38 (8th Cir.1963) (Blackmun, J.,), (quoting *In re Nathan's Estate,* 166 F.2d 422, 425 (9th Cir.1948)), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *see also Collins v. Commissioner of Internal Revenue,* 216 F.2d 519, 522 (1st Cir.1954).

The "willing buyer" and "willing seller" whose judgment the court is charged to simulate are hypothetical persons—constructs of the law. *See, e.g., United States v. Simmons,* 346 F.2d 213, 217 (5th Cir.1965). As a matter of law, they are not experts. *Cf. Penn v. Commissioner of Internal Revenue,* 219 F.2d 18, 21 (9th Cir.1955). They are attentive to expert advice, but they know that experts often differ. In the end they test the experts' advice, and the for-

should be submitted with the return, including copies of reports of any examinations of the company made by accountants, engineers, or any technical experts as of or near the date of the gift. (Emphasis added.)

7. § 25.2512–3 Valuation of interests in business

(a) Care should be taken to arrive at an accurate valuation *of any interest in a business which the donor transfers without an adequate and full consideration in money or money's worth. The fair market value of any interest in a business, whether a partnership or a proprietorship, is the net amount which*

*a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.* The net value is determined on the basis of all relevant factors including—

(1) A fair appraisal as of the date of the gift of all the assets of the business, tangible and intangible, including good will;

(2) The demonstrated earning capacity of the business; and

(3) The other factors set forth in paragraph (f) of § 25.2512–2 relating to the valuation of corporate stock, to the extent applicable. (Emphasis added.)

mulas the experts advance to bolster their advice, against common sense. The willing buyer and willing seller are not limited to choosing one formula or another among competing formulas advanced by experts.

All formulas are predicated on assumed premises. The willing buyer and willing seller are free to challenge the premises, and for good reason to choose other premises and thus arrive at a different result. The willing buyer and willing seller are also free, moreover, not to accept as controlling the path of deductive reasoning from a preselected formula. They need not choose a set of premises (inherent in a formula) without thought to outcome and then accept the outcome calculated from the chosen premises as controlling, regardless of how strange the result may seem. These worldly wise hypothetical persons may instead suspend choice until they have examined the outcomes of different proposed formulas to consider which makes more sense, taking into account not only the competing arguments about proper premises but as well competing arguments about how well the outcomes accord with appraisals from other perspectives, including a common sense evaluation of consistency of outcome with the purpose for which value of the stock is being determined. Indeed, the willing buyer and willing seller may conclude that there are germs of truth and insight, more or less, in different formulas that show the outcomes of different models of valuation, founded on different assumptions. All such factors may be "things that a buyer and seller would wish to know and consider before reaching a conclusion as to fair value," *Hamm v. Commissioner, supra,* 325 F.2d at 938. The final figure on which the hypothetical willing buyer and willing seller would agree is likely to be one within a range the formulas help to define but may be different from the figure produced by any of the formulas advanced by expert witnesses. *See id.* at 939–41 (sustaining an "ultimate finding" of "not less than" a stated figure). This is inherently the nature of a legal "standard" for valuing stock by the "willing-buyer-willing-seller" criterion. It calls for an evaluative determination by the factfinder, not a precise calculus from authoritative premises and ascertained facts. *Cf. Simonds v. Guaranty Bank and Trust Co.,* 492 F.Supp. 1079, 1082–84 (D.Mass. 1979).

Proof that a certain formula is commonly used by experts who advise buyers and sellers is quite relevant and may in appropriate circumstances be persuasive, but in the end the question the court must determine is value under the willing-buyer-willing-seller standard and not which, if any, among the conflicting experts has correctly applied an authoritatively prescribed formula.

For this reason, I cannot sustain a contention that one formula or another must be followed, and I need not and do not parse every argument appearing in the briefs and in the expert testimony that using a given formula or method would be to find "cash equivalency," "liquidation" value, or "going-concern" value rather than value according to the willing-buyer-willing-seller standard. Even if aptly applied as labels for one or another step in explanation of expert advice on valuation, terms such as these do not have talismanic significance. I do, however, take into account these arguments as well as the testimony and arguments of counsel centered on formulas. A contention that one must accept a stated proposition as controlling may be but an overstatement of a point deserving some weight. Rather than inquiring whether overstated advice should be rejected, it is closer to the mark to inquire what weight a willing buyer and a willing seller would give to expert advice, whether expressed in jargon and said to be obligatory or stated instead in a form less opaque and strident. The final determination of value under the willing-buyer-willing-seller standard may be, and usually is, not a calculation by formula but a judgmental choice about the relative weight to be given to factors reflected in different sets of proposed assumptions inherent in different formulas advanced by expert witnesses and counsel.

It is standard fare for a trial judge to tell jurors they may accept all, some, or none of

an expert's testimony, and specifically that they may discredit expert opinion entirely or partly when they find that it is based entirely or partly on assumptions that are not supported by the evidence before them. So may a trial judge, as factfinder, credit in part and discredit in other respects.

## VI. Methodology Advanced by the Parties

Plaintiffs and defendant have offered extensive expert testimony of highly qualified experts. Plaintiffs rely heavily on the expert testimony of Allan R. Finlay, an experienced financial analyst, and Herbert French, Jr., an experienced investment banker and adjunct professor of investment banking at Boston University Graduate School. Defendant relies heavily on the expert testimony of Professor Stewart Myers, Professor of Corporate Finance at Massachusetts Institute of Technology, and Robert Long, an experienced investment banker. Not surprisingly, the opinions of the expert witnesses clash, supporting different values per share of the donated stock, reached through different calculations. The methods advanced by different experts and by counsel nevertheless have certain features in common. All include three steps in determining the value of shares of Class B Common of W Corp and GID respectively:

(1) First, the Total Equity Value is calculated by determining asset value, deducting short-term liabilities (in the case of W Corp only), applying any applicable discount, and deducting long-term debt;

(2) Second, a value is determined for the Preferred Shares and subtracted from the Total Equity Value;

(3) Third, the remaining amount is allocated between the Class A Common (which has voting power) and the Class B Common.

Although I welcome this agreement of the parties on methodology and accept it as a useful way of organizing consideration of factors bearing on the ultimate judgmental issue of valuation, for the reasons stated in part V, *supra,* I treat the methodology and calculations made in applying it as aids to judgment about value under the willing-buyer-willing-seller standard and not as elements of an authoritative formula. Thus, although I consider each proposed step as developed in the testimony of each witness, I do so for the purpose of arriving at an informed final judgment and not as if I were resolving a sequence of discrete issues of law.

Defendant has advanced arguments founded on assumptions about future conduct of the actual donors and donees of the stock. Plaintiffs contend that consideration of the assumed intent of the parties is inconsistent with a standard of valuation concerned with the hypothetical willing buyer and willing seller who, after all, are not identical to the parties in the case. I agree with plaintiffs that basing value on assumptions concerning the identity of the parties or on findings about the intent of the parties as to how they will deal with their respective interests would be inappropriate. It is appropriate, however, to take into account all legal interests in a corporation, the stock of which is being valued, as those interests bear upon the practical likelihood and the effect on value, as of the time of the gift, of the future exercise of options legitimately available to the owners of various interests.

## VII. The MPI Study

The introduction to the MPI appraisal of W Corp (Pl.Ex. 1), which plaintiffs relied on in submitting their gift tax returns, stated that:

> The purpose of this report is to determine the fair market value, on a going concern basis, of minority blocks of the Non-voting Class B common Stock of W Corporation as of October 16, 1972. The concept of fair market value adopted herein is that value at which a willing buyer and willing seller, both well informed as to the facts, but neither under any compulsion to act, would arrive in an arm's length sale of the asset in question. This value takes into account all pertinent facts and conditions either existing, or which reasonably might have been anticipated on the valuation date, to the

extent that such information has been available to us.

The steps undertaken by the MPI Study (set forth in Def.Ex. 74, pertaining to the October 16, 1972 gifts, and Def.Ex. 77, pertaining to the November 1, 1972 gifts) are as follows:

a. W Corp Assets

(i) CIC. W Corp owned 7,842,019 shares or 71.175% of the CIC shares outstanding. MPI valued each share of CIC stock at $11.625, the average market price on 10/16/72. MPI did not apply a discount for lack of marketability. The result is that the MPI Study valued W Corp's CIC stock at ... $91,163,000

(ii) CMI. 17,400 shares @ $12.9375 ... $ 225,000

(iii) Continental Advisers. 24% Partnership Interest. MPI used a 13.0 multiplier of Continental Advisers' $2,890,000 1972 earnings and then applied a 7% discount for lack of marketability of the 24% interest (Pl. Ex. 1, p. 51), 24% of (13 x 2,890,000) less 7% discount ... $ 8,886,000

(iv) Other assets valued at ... 5,825,000

Total W Corp Assets under MPI Study as of 10/16/72 ... $105,099,000

b. Next, MPI deducted W Corp's liabilities (other than long term debt) to arrive at W Corp's "Net Asset Value." ... –9,200,000
... $95,899,000

c. Then MPI applied a 35% Discount from Net Asset Value ("DNAV"). MPI determined the discount from net asset value at which minority blocks of stock in closely held, nondiversified investment companies sell by comparing W Corp to similar publicly-held companies. According to MPI, the reasons for the discount from net asset value at which the stock of these companies normally sell are the absence of shareholder interest over the portfolio and federal taxation of earnings and capital gains. The comparability criteria are set forth in Pl. Ex. 1, pp. 18–22. The comparison is performed in Pl. Ex. 1, pp. 29–38.

Deduction of the 35% DNAV leaves [rounded] "market value." ... $62,334,500

d. Then MPI deducted W Corp's long-term debt ... –2,465,000
leaving Total Equity of ... $59,869,500

e. Then, in accordance with the recapitalization plan, MPI assigned 85% of W Corp's value to the 508,890 Preferred Shares. 85% x 59,869,500 ... –50,889,000
This leaves equity for the Class A and Class B Common shares. ... $8,980,500

f. Then MPI determined that because only Class A Common had voting power, 5% of the total value of the company's equity ... –2,993,500
should be deducted from the amount allocated to ... $5,987,000
the common shares and attributed to Class A Common only. The remainder is divided equally between the 600 share blocks of Class A and Class B common, valuing the latter at ... $ 598,700

g. Finally an allowance for lack of marketability of the Class B common was calculated by reference to a study of "cost of Flotation of Registered Equity Issues" performed by the SEC in 1970. Pl. Ex. 1, p. 41. Using that study, MPI calculated a 16.5% discount based on the value of the two blocks of 120 Class B shares given on 10/16/72. Pl. Ex. 1, p. 42. The discount (98,700) was deducted from the value of the Class B shares, producing a figure of ... –98,700
... $500,000
or, for each share of the 120 share block, ... $ 4,167

Using the $11.75 average per share price of CIC on 11/1/72, MPI applied the same analysis to the

two 54 share blocks given on 11/1/72, and determined that each block was worth $237,300 or, after allowing for a 20% discount for lack of marketability, a per share value of ... $ 4,395

h. MPI valued GID's assets in the same manner.

## VIII. Disputed Factors Affecting Values

### A. Value of CIC Stock

In October, 1972, five days before the gifts of October 16, 1972, the SEC announced an investigation of CIC's operations. The investigation had a dramatic adverse impact on the value of CIC stock, causing the market price of stock traded on the New York Stock Exchange to fall 30% in five days. Plaintiffs contend, moreover, that both the market and the MPI Study did not reflect, and alternatively that they inadequately reflected, the changed value of CIC stock incident to the SEC investigation. I find more persuasive, however, defendant's contention that the SEC investigation was highly publicized and that the market fairly represented the assessment of risks and prospects as viewed by informed buyers and sellers. Moreover, contrary to what might be understood as the import of the testimony of the witness French, I find that the then anticipated impact of the SEC investigation on the value of CIC's stock would have been affected, in the views of a willing buyer and willing seller, by the fact that, although charges of fraudulent practices were included, the aim of the investigation was broader. It was an investigation aimed at consideration of establishing new law or regulations relating to captive brokers, rather than being aimed exclusively at CIC.

I am not able to credit the opinion of the witness Finlay that a reasonable buyer, though unable to foresee the precise timing, would have been able at that early time to foresee CIC's default on a bank loan (which occurred in April 1975) and CIC's ultimate need for reorganization under Chapter XI (which occurred in 1976). The market price of registered CIC shares was still at $9.75 in February and March, 1973, though it fell to levels between 25 cents and 50 cents in 1974. Even though the SEC investigation and its aftermath were contributing fac-

tors, these events of 1974, 1975 and 1976 were the product of many other influences as well. As noted by one of the plaintiffs, speaking for CIC in the 1973 Annual Report of CIC, Def.Ex. 39, the economic market and interest rates that were unprecedented (as of those "good old days"). Neither the plaintiffs nor buyers and sellers in the securities market of 1972 foresaw these economic developments, which proved to be extraordinarily adverse for CIC. Moreover, even if adverse economic conditions such as these had been foreseen as possibilities, they would have been regarded as part of the down-side risks incident to such factors as the large debt service requirements associated with CIC's acquisition of the entity, Waddell & Reed, to be weighed against more favorable prospects for the future in making a careful assessment of value. Only 20/20 hindsight enables one to give such weight to the bank loan default and reorganization as Finlay did in his opinion testimony.

For similar reasons I conclude that plaintiffs overstate a relevant point in arguing that the sanctions later imposed by the SEC reduced the value of the CIC stock. A fairer statement of the point is that the possibility of such sanctions, as forecast on the valuation date, was relevant to the market price and is relevant to the willing-buyer-willing-seller value.

Because W Corp owned a controlling block of CIC stock, it is reasonable to conclude, as Myers testified, that the stock would have a value based on sale in a private placement to a buyer wishing to purchase control, not in a public offering, since sale in a public offering would dissipate the control premium. Despite French's testimony to the contrary, I give weight to the premise, as proposed by Myers, that the sale of CIC shares would produce a *control premium* for W Corp. It would be inappropriate in these circumstances to apply such a large discount as plaintiffs urge, if any discount at all, for lack of marketability for W Corp's block of CIC shares. This conclusion is also supported by CIC's steadily increasing earnings

for 1971–1972, as disclosed in CIC's Annual Reports, Pl.Exs. 11 and 12.

Plaintiffs argue that W Corp's CIC shares should be discounted because they are not registered. I find that this argument deserves insubstantial weight. First, the control premium tends to offset this factor. Second, although the need to register controlling portions of stock is a significant factor, supporting a discount from *net asset value* when determining the value of closed-end investment companies, it does not follow that a comparable discount should be applied against the value of assets in the form of unregistered *shares of stock*, the value of those shares of stock having been estimated as comparable to the value on a public exchange of other, registered shares of stock in the same company. No evidence was presented as to valuing the *assets* (rather than the *stock*) of CIC and discounting that value, as an alternative to working from the market price of the registered CIC *stock*.

■ In summary, weighing all the evidence in the context of a methodology in which a discount from net value of the assets of W Corp and CIC is applied in a later step (*see* part VIII–C, *infra*), I find that the MPI valuation of W Corp's stock in CIC at $91,163,000 was a reasonable estimate.

## B. Value of the Interest in Continental Advisers and CAI

■ The parties agree that MPI used the wrong earnings multiplier, 13.0, instead of 9.2, in valuing W Corp's and GID's interests in Continental Advisers. They disagree over whether a discount for lack of marketability is appropriate. I credit Myers' view that no such discount for lack of marketability is appropriate for two reasons. First, it is appropriate to consider the stream of earnings method of valuing Continental Advisers as premised upon the value that would be arrived at, for interests in Continental Advisers, between a willing buyer and a willing seller treating it as a going concern, and not alone as if the willing buyer would in turn immediately liquidate

it. This is not to say that defendant is correct in characterizing Finlay's position as assuming conversion of assets into cash. Finlay's testimony also recognizes that the entities being valued are going concerns. Nevertheless, a contention that the willing buyer and willing seller would discount for lack of marketability becomes less persuasive when successive discounts are applied, as would be the case if a discount were applied both here and as discussed in VIII–C, *infra.* Second, W Corp and GID together were controlled by the same principals. The two firms owned a controlling interest in Continental Advisers. An owner in the position of W Corp would be unlikely to put its interest in Continental Advisers up for sale except when GID was doing the same. Thus the appropriateness of a control premium more than offsets factors weighing in favor of a discount for marketability. *See Blanchard v. United States,* 291 F.Supp. 348 (S.D.Iowa 1968); *Estate of Piper,* 72 T.C. 1062, 1074 (1979).

The reasoning stated in the next preceding paragraph applies also to valuing the interest of GID in CAI. I credit the view that a discount for lack of marketability is not appropriate at this step of the methodology of valuation that the parties have advanced in this case.

### C. Discount from Net Asset Value

MPI applied a 35% discount to total assets of both W Corp and GID, based on its study of comparable companies. Plaintiffs apply a 35% discount at this step. The government concedes that this is the correct approach if, but only if, the companies' assets are first valued as going concerns. The government argues, however, that if the holdings are valued as if converted to cash a far lower figure is appropriate. Having declined to credit the view that a discount for lack of marketability should be applied in relation to the factors discussed in VIII–A and VIII–B, *supra,* I credit the view that it is appropriate to apply a 35% discount here.

### D. Value of W Corp's Preferred Shares

MPI used a $100 per share figure, based on the conversion value of the Preferred on the recapitalization date. According to Myers, it is more appropriate to use an $80 per share figure, representing the value after a discount from the liquidation value because the Preferred Share's $6.00 noncumulative dividend rate was lower than the prevailing 7–8% interest rates. I find this to be a factor deserving weight.

Finlay applied a formula (Pl.Ex. 15) to arrive at a value per W Corp Preferred Share of $67.52 (and $65.49 per share for GID Preferred). This lower figure is premised in part, however, on the equity value of W Corp as Finlay viewed it, which in some respects I have not credited. Also, of course, this lower figure for Preferred, if credited, would work against plaintiffs' interests in leaving more equity for the Class B shares.

Plaintiff argues that because of convertibility the value of Preferred cannot properly be treated as less than $100 per share unless the equity value of W Corp and GID is insufficient to support such a conversion value. This contention cannot be sustained. Myers testified that an $80.00 figure was more appropriate, because a reasonable investor would understand from the nature of the recapitalization that holders of the Preferred would not be likely to exercise their option to convert because to do so would ruin the "asset freezing" quality of the deal for gift tax purposes. An element of the gift is the likelihood that the donors will not convert the Preferred no matter how valuable the corporation has become. Myers testified that a hypothetical seller of Class B shares would realize this and price the shares accordingly. This position cannot be accepted as a firm guide, because it depends on whether the hypothetical seller is considered to be someone for whom the Preferred shareholder will refrain from converting his shares. The possibility that this prediction will prove to be valid is a relevant factor, however. I am required to look at all the values given to the donee of the gift, see 26 C.F.R. § 25.2512–1, *supra,*

and it is appropriate to take into account the probability that the Preferred would not be converted.

To ignore this factor would be to exalt form over reality, the real likelihood of nonexercise of the conversion rights, which a willing buyer and willing seller, who are hypothetical persons of practical common sense, would take into account. It would be to lose sight, also, of the fact that the objective of the applicable statute and regulation is to establish fair value for gift tax purposes, and to apply the willing-buyer-willing-seller standard to this end.

If one disregarded the probability that conversion rights would not be exercised for very practical reasons, including the family relationship, the effect would be to disregard factual expectations to which a willing buyer and willing seller would be sensitive. Just as the decisionmaking of the willing buyer and willing seller is not controlled by formula, so also it is not controlled by legalism. The willing buyer and willing seller are attentive to the advice of lawyers about legal rights, as they are attentive to the advice of experts on corporate finance and investment, but they are also attentive to the probabilities of human behavior incident to relationships and to incentives they see in those relationships. To hold that these factors must be wholly excluded from consideration in determining value under the willing-buyer-willing-seller standard would be to adopt a rule inconsistent not only with the basic nature of the standard but also with its usefulness in the specific context of valuation of donated shares of stock. I do not rule that a factfinder must assume that the conversion rights will not be exercised, as the government would have me do, but neither do I rule that it must be assumed that they have a value at a given time equal to what would be realized if the conversion rights were exercised at that time, as plaintiffs would have me do. The hypothetical willing buyer and willing seller are less rule-bound and more practical than the contentions of the parties suggest.

This is not to say, however, that I accept defendant's contention that the value of the asset given up by the donor may be different from the value of the asset received by the donee. Every argument that the court is bound by a calculated minimum figure for which the willing seller would sell or by a calculated maximum figure for which the willing buyer would buy—without regard to what the other would pay or accept—is fallacious. All such arguments fail to take account of the fact that the willing seller cannot sell except to a willing buyer, and the willing buyer cannot buy except from a willing seller. If a gap remains between the separately calculated seller's minimum and buyer's maximum, no deal is struck. These arguments are therefore inconsistent with the hypothesis that the willing buyer and willing seller always strike a bargain, even if it has to be a compromise somewhere between the calculated seller's minimum and buyer's maximum. The controlling standard is neither a willing-buyer standard nor a willing-seller standard. It aims instead for finding a single figure of value on which a willing buyer and a willing seller would have agreed, and it takes into account all of the perspectives on value that each would have brought to bear in their negotiations leading to agreement on value.

█ As indicated in the foregoing comments, I accept as an aid to judgment—a factor to be weighed—the outcome of the method of determining value of Class B shares by determining the value of Preferred and deducting it. Nevertheless, for the reasons stated in part V, *supra,* I do not accept this method as obligatory. Thus, the value the Preferred would have if a willing-buyer-willing-seller standard were applied separately to that sub-issue in this case is useful but not rigidly controlling in determining the ultimate issue of value of the Class B Common under the willing-buyer-willing-seller standard. The question at issue is not the value of Preferred, but what impact the existence of the Preferred (taking into account among other factors legal rights and the likelihood of their being exercised) has upon value of Class B Common. Influenced as factfinder by the approach to

valuation of Preferred offered by defendant, I find that the Preferred stock had a lesser value than that argued by plaintiff. Thus, to the extent the value of Preferred is relevant to the value of the Class B common stock, plaintiff has understated the resulting value of the Class B common.

In applying the willing-buyer-willing-seller standard of valuation to property that was not in fact sold, we are of course making estimates based on contrary-to-fact hypothetical circumstances. It is important to remember, however, that the willing buyer and willing seller whom we hypothetically create are persons of practical acumen. They are influenced more by facts they know than by contrary-to-fact hypotheticals. We should not attribute to them, as an obligatory characteristic, our own penchant for thinking hypothetically.

### E. Allocation of Voting Premium

Both MPI and Finlay concluded that the voting power of the Class A Common entitled it to a premium equal to 5% of the total voting equity of W Corp, and that this amount should be deducted from the equity available for Class A and Class B combined.

Defendant's expert, Myers, calculated the voting premium by splitting in half the equity remaining after the allocation to the Preferred shares and then deducting 20 per cent from Class B's half. I give weight to plaintiffs' argument that whatever is deducted from value of Class B shares because of this factor has a bearing on the value of Class A shares, although in the present case this makes no difference in the value proposed for Class B shares. Even so, I find it appropriate, subject to a reservation stated below, to give greater weight to the view reflected in the MPI Study and in Finlay's testimony, calculating the control premium as a percentage (5%) of the entire equity available to Class A and Class B combined and then deducting this amount from the equity to be allocated between Class A and Class B combined. In light of my weighing of other factors bearing on valuation, however, the difference produced by these different methods is not a factor of decisive

significance in any event. Some weight should be given to Myers' point that this way of calculating voting premium could produce absurdly disproportionate value as between voting and nonvoting shares in extreme circumstances. For this reason, the MPI-Finlay method of calculating value of premium would not be appropriate for adoption as a firm rule. But in view of the weight I give to other relevant factors in this case, the extreme circumstances that would produce absurd results are not presented here. Again, I am weighing factors bearing on value, not choosing between rigid rules.

### F. Discount for Lack of Marketability of the Donated Shares

Finlay applied a 35% discount. MPI applied a discount based on the size of each block of donated stock. Myers assumed that a rational seller (the Trusts) would attempt to sell all the donated shares together, and applied a discount (derived from the MPI appraisal) for the cost of "floating" the entire amount of donated stock (Def.Ex. 79).

I give greater weight to Finlay's view of this issue. Myers looked only at the cost of flotation, not the problems resulting from lack of marketability. A 35% discount for lack of marketability appears reasonable.

Defendant contends that, for policy reasons applicable distinctively to gifts of interests in a family-owned investment company, no discount from asset value should be applied. This contention, however, whatever its merits might be as a policy argument, is inconsistent with the willing-buyer-willing-seller standard adopted in applicable regulations, which I conclude are consistent with the applicable statute.

### IX. Conclusion

Using the three-step method of valuation upon which the parties agree and the weighting of disputed factors stated in part VIII, one would arrive at a calculation of value of the donated shares in excess of the figures reported by plaintiffs. This result

would be reached both as to the 120 share blocks donated on October 16, 1972 and as to the 54-share blocks donated on November 1, 1972.

■ I find that the contemporaneous evaluation of the donated shares in the MPI study, if not indefensibly low, was at best a very conservative estimate of the value at which a willing buyer and willing seller would have arrived. Applying the willing-buyer-willing-seller standard to the circumstances of this case, I find that the value of the donated shares of stock was not less than the values as reported by plaintiffs in filing their returns.

It bears emphasis that in arriving at this factfinding I have examined competing arguments of the parties for application of different formulas as aids to arriving at a determination of value of the donated stock under the willing-buyer-willing-seller standard, and not as if determining an authoritative formula and calculating value precisely by that formula.

In the interest of candor and clarity I am moved to say more in order to expose and attempt a reasoned response to a dilemma inevitably encountered in applying the willing-buyer-willing-seller standard to a gift. There is a seeming incongruency between two authoritative directives—first, that all relevant facts and elements of value of the property as of the time the donor transferred to the donee must be considered and, second, that the hypothetical transaction between the willing buyer and willing seller is a sale, not a gift.

A gift, and especially an intra-family gift, may transfer property interests that would never be fashioned for transfer in an arms-length transaction—which is the ordinary meaning of "sale." For example, if in a recapitalization Preferred shares are created on terms such that a holder actuated solely by economic analysis would immediately convert them to shares of common, but the total context in which the donor created them plainly demonstrates that the transfer is made on terms that will cause the conversion not to occur, is the factfinder, in thinking hypothetically of a sale, supposed to disregard these characteristics of the property and the transaction in which it was conveyed because in reality nothing exactly like this would ever occur in a sale? Or, instead, must the decisionmaker nevertheless consider all factors bearing on value, even if they could not exist in just this combination in a real-world sale? Put another way, does the directive to a factfinder to think hypothetically of a sale insulate from consideration some characteristics of the property interests that the donor in fact transferred to the donee, because those characteristics do not appear in sales? An affirmative answer would create an open door to legitimate gift and estate tax avoidance by allowing transfer of property interests designed to have practical value far in excess of hypothetically determined value. The question is to be answered, however, consistently with the text and purpose of the primary directive—the statute—and the implementing regulations. To one who is guided by these directives and the relevant precedents, the most appealing answer to the dilemma is that the decisionmaker is directed to envision not the usual arms-length sale between real-life bargainers but instead a sale of a hypothetical variety—indeed, of a contrary-to-fact hypothetical variety. If the reality is that in human experience property interests exactly like those transferred in the case at hand are transferred in gifts but not in arms-length transactions, either a directive to ignore some characteristics of the donated property or a directive to assume that sales of such interests are made would be a directive to ignore human experience. I do not read the statute, regulations, and precedents in this way. I read them instead as directing that, confronted with the fact that human experience provides no comparable sales to be examined for guidance, the factfinder must look to the next best source—a hypothetical view of what such a sale would be if one were possible, constructing the hypothetical with as little change from reality as possible. The directive is not to change the characteristics of the property transferred but instead to imagine what deal the equal

bargainers would strike if it were possible to transfer the same property by sale.

Thus, in response to the dilemma of considering all factors bearing on value, when in human experience some of those factors are not transferred in sales, the factfinder is directed to achieve a triumph of hypothetical reasoning over the obstacle of absence of directly relevant human experience. The directive is hypothetically to assume that such a sale was possible rather than hypothetically to assume that the property was different and that some of its elements of practical value were not transferred.

Not as a substitute for the directed hypothetical inquiry, but instead as an analogy, it may be helpful to consider a hypothetical sale of one share of the donated common by a donee to another person immediately after the receipt of the gift. This hypothetical transaction comes close to preserving for the property the characteristics it has in the actual transaction of gift; the purchaser from the donee rides with the donee, whose continued interest in the remaining donated shares tends to preserve all the characteristics they had when given, and not just those that are commonly attached to property that is being sold.

The aim of factfinding by this method—and my aim in considering how I should decide the present case—has been to evaluate the parties' arguments about formulas, as well as arguments about other factors in evidence that bear upon the issue of value, as the willing buyer and willing seller would evaluate them. Since these consummate negotiators, who invariably achieve an agreeable bargain, are mythical persons endowed with characteristics prescribed in authoritative writings, the undertaking of determining what they would decide, on given evidence not exactly like any recounted in precedents, might better be discharged with the benefit of interpretive insights and skills associated more often with the theater than with the court. Like the actor or actress who recreates the character from the guidelines the playwright has given, I must try first to understand the characters created in the authoritative statute, regulations and precedents, and then, departing from the custom of the stage, occupy not one but two roles simultaneously—those of the willing buyer and the willing seller—coming finally to an agreement with myself—or more precisely between the two whom I am simultaneously impersonating—on the value of the stock at issue. A judge might be daunted by such an undertaking were it not for the reassuring thought that, as surely as one who

> ... never saw a moor,
> [And] never saw the sea;
> Yet [may] know ... how the heather looks,
> And what a wave must be [,] [8]

so one who never met the willing buyer or the willing seller yet may know with reasonable certainty how they would behave, and in this instance not just "as if" but in part because a chart—albeit a rather incomplete one—has been given in the authoritative sources.

The statute, regulations, and precedents fix certain characteristics of the willing buyer and willing seller as a matter of law. They are persons who do not accept a formula as binding. To them, formulas are only tools. They do not overlook any relevant evidence. They weigh every relevant factor. They are not experts, but they are attentive to expert advice. They eschew legalism, but they weigh the import of legal rights. When performing their roles in a trial court, these hypothetical persons accept as binding the advice the trial judge gives them about legal rights, subject of course to correction in a higher court. Fi-

---

**8.** Poems by Emily Dickinson (George Monteiro ed. 1967, Scholars' Facsimiles & Reprints), IV, Time and Eternity, XVII:

> I never saw a moor,
>   I never saw the sea;
> Yet know I how
>   the heather looks,

> And what a wave must be.
> I never spoke with God,
>   Nor visited in heaven;
> Yet certain am I
>   of the spot
> As if the chart were given.

nally, for them, no negotiation is too difficult. They always arrive at a price the buyer willingly pays and the seller willingly accepts.

The regulations and the precedents, as I read them, require more than just lip service to the proposition that the willing buyer and willing seller ordinarily do not allow themselves to be bound by formulas. If ninety percent of the energies of advocates and the factfinder are focused on formulas, it is difficult indeed to keep formulas in their place as tools and not binding rules. The risk that undue concentration upon them will allow them greater weight than they deserve is in my view well illustrated in this case. For example, no formula suggested by any party or any witness in this case fully captures the essence of the problem of valuing the Preferred stock in W Corp and GID. A formula is scarcely needed for the easy case in which the total equity is so great that the Preferred is obviously worth at least $100 per share. The terms of the capitalization make it clear that the Preferred can never be worth more than $100 per share, and in the supposed circumstances it will not be worth less. In contrast, for circumstances in which the total equity is barely enough to equal an amount calculated by multiplying the number of shares of Preferred by $100, allocating $100 per share to the Preferred would render all common stock worthless. Were it used, it would make nonsense of a conversion plan, like that adopted in the recapitalization of W Corp and GID, in which shares of Preferred are traded for shares of Common of equal value as determined by an appraisal as of the date of conversion. Of course, no party has argued for applying such a rule. How, then, would one go about developing a suitable formula for valuing the Preferred in all reasonably expectable cases—or else a set of formulas, together with a rule (another formula) for determining which formula in the set applies in given circumstances?

I am driven to the inference, as factfinder on the evidence before me in this case, that the formulas—the methods of valuing the Preferred—advanced in the evidence and in the briefs were not created by deduction from authoritative premises but instead were in significant part developed, whether consciously or subconsciously, by a process of trial and error. By that process, a formula tentatively entertained may be discarded when it produces a result that, from a fresh perspective, appears flawed. The formulas that are presented in evidence by effective witnesses and advocates are the survivors, and may even be the fittest of all the formulas considered. Still, it does not follow that any one of them is apt, for there remains the possibility, which the willing buyer and willing seller may seriously entertain, that no formula among all those proposed has captured and properly weighted every factor that they would take into account in their negotiations to a bargain that both would find fair and reasonable.

By way of example, I refer to one such factor that was argued in the present case, and that I find relevant, but that no formula captures. The plaintiffs are, and were in 1972, experienced in securities matters. With the benefit of advice of experts in law and finance, they executed an elaborate recapitalization of W Corp and GID, concluding with gifts of shares of Class B Common that required substantial gift tax payments on assumptions regarding value arrived at after a careful weighing of expert advice. One aim of the transaction was to place in the hands of donees defined rights to benefit from long-term appreciation of the equity in the two corporations, thereby legitimately avoiding estate and gift taxes that might have accrued had later transfers been made. Now, years later, as factfinder, simulating the decision of a willing buyer and willing seller, I am asked to find—according to one of the formulas—that in truth the value of the donated stock was so small that it was within the exemption allowed by the gift tax law. Certainly the plaintiffs, who themselves were experts and who were the closest of all the experts to the transactions, did not think so contemporaneously. I do not suggest that any principle of estoppel should be

applied against them, or that on any other ground a rule of law should preclude their later claim that their valuation was in error. I do suggest, however, that their contemporaneous valuation, as declared formally in their returns and as manifested informally in their considered conduct, is a relevant factor to which the willing buyer and willing seller would give some weight. In the present case, I find the evidence of a value at least as high as the value declared in the returns compelling entirely apart from inferences that may fairly be drawn from the considered course of conduct culminating in the recapitalizations and gifts. This added factor simply gives me an increased sense of assurance that, difficult as simulating the decisionmaking of the willing buyer and willing seller may be in some cases, in the present case the proper outcome is crystal clear.

Judgment for the defendant.