CTUW GEORGIA KETTEMAN HOLLINGSWORTH, GEORGIA
L. KETTEMAN TESTAMENTARY TRUST FBO JOHN M. AND
JEAN B. REINEKE, S. PRESTON WILLIAMS, ESTATE OF
JOHN M. REINEKE, JEAN B. REINEKE, WILLIAM K.
HOLLINGSWORTH, AND NORMA L. HOLLINGSWORTH,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 7936–81.    Filed January 28, 1986.

*Thomas E. King, Thomas E. Carew*, and *V. Edwin Stall*
for the petitioners.

*Michael L. Boman* and *James E. Cannon*, for the respon-
dent.

SWIFT, *Judge*: In separate notices of deficiency dated
January 22, 1981, respondent determined a deficiency for
1967 in the Federal gift tax liability of Mrs. Georgia L.
Ketteman (Mrs. Ketteman), deceased, in the amount of
$458,126.25, and an addition to tax under section 6651(a)(1)[1]
in the amount of $114,531.56. By amendment to his answer,
respondent reduced the amount of Mrs. Ketteman's Federal
gift tax deficiency to $149,743.75 and the amount of the
addition to tax to $37,435.94.

Mrs. Ketteman died on December 24, 1972, and petition-
ers herein were the beneficiaries of her estate. Respondent,
therefore, determined that petitioners were transferees of
the assets of Mrs. Ketteman and were liable for the
deficiency in Mrs. Ketteman's Federal gift tax liability and

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the year
in controversy.

addition to tax, limited to the value of the assets each petitioner received from Mrs. Ketteman's estate. The limits of each transferee's liability are set forth below as determined by respondent in his amended answer. The amounts are duplicative in that payment of Mrs. Ketteman's total Federal gift tax liability, including the addition to tax and interest, by one or any combination of petitioners will discharge the remaining petitioners from liability therefor:

| Petitioner | Limit of liability |
|---|---|
| CTUW Georgia Ketteman Hollingsworth ............ | $302,218.79 |
| Georgia L. Ketteman Testamentary Trust | |
| FBO John M. Reineke & Jean B. Reineke.......... | 302,218.79 |
| S. Preston Williams................................. | 130,833.33 |
| Estate of John M. Reineke......................... | 130,833.33 |
| Jean B. Reineke .................................... | 130,833.33 |
| William K. Hollingsworth........................... | 130,833.33 |
| Norma L. Hollingsworth ............................ | 130,833.33 |

The primary issues for decision are: (1) Whether Mrs. Ketteman transferred property to a closely held corporation for less than full and adequate consideration and thereby made a gift of the property giving rise to a Federal gift tax liability (this issue turns on the fair market value of the property); (2) whether the $30,000 lifetime exemption from taxable gifts is available for the property transferred in 1967; (3) whether the $3,000 per-donee annual exclusion from Federal gift tax liability applies to Mrs. Ketteman's transfer of property to a closely held corporation; and (4) whether an addition to tax under section 6651(a)(1) is appropriate in light of Mrs. Ketteman's failure to file a Federal gift tax return for 1967.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners CTUW Georgia Ketteman Hollingsworth and Georgia L. Ketteman Testamentary Trust FBO John M. and Jean B. Reineke, are trusts and hereinafter collectively will be referred to as petitioner trusts. The co-trustees of each trust are petitioner S. Preston Williams, and the United Missouri Bank of Kansas City, N.A., whose principal place of business at the time of filing the petition was in Kansas City, Missouri. All individual petitioners herein

resided in the State of Missouri at the time the petition was filed.

In 1967, Mrs. Ketteman was an 80-year-old widow who owned approximately 231 acres of farmland (the Ketteman property). The Ketteman property was located in close proximity to property on which the Kansas City International Airport was to be constructed and in the southeast quadrant of property intersected by Interstate Highway 29 (I–29) and Missouri Highway 71-Bypass (71-Bypass), which intersection eventually became the main entrance to the airport. During the years 1965 through 1968, there was significant speculative interest in property that was located near the airport. Commercial development of such property was anticipated, and real estate developers often made inquiries concerning possible purchases of the property.

Apparently, the first person to contact Mrs. Ketteman about purchasing the Ketteman property was Leo Eisenberg (Eisenberg), a real estate developer in the Kansas City area. In January of 1967, Eisenberg offered Mrs. Ketteman $2,000 per acre for the entire Ketteman property, or a total of $460,000. Eisenberg anticipated that the western 80 acres of the Ketteman property had potential for commercial development, and the remaining 151 acres had potential for industrial or residential development.

In January of 1967, at the time Eisenberg made the offer to Mrs. Ketteman, he was uncertain about the location of the main entrance to the airport. The original plans for the airport, as designed in 1952, provided that the main entrance would be located at the intersection of I–29 and 112th Street, approximately 1 mile south of the Ketteman property. In February of 1965, however, city and State authorities began to implement revised plans that relocated the main entrance to the airport at the intersection of I–29 and 71–Bypass (immediately adjacent to the Ketteman property). By February of 1967, preliminary approval to locate the main entrance at 71–Bypass had been secured, but until final approval was obtained from State agencies, which occurred in August of 1967, there was some chance that the location of the main entrance would be changed.

Mrs. Ketteman refused Eisenberg's offer. She decided to convey by will the Ketteman property to her niece, to

petitioner Jean B. Reineke, and to Mrs. Reineke's husband, John M. Reineke[2] (the Reinekes), and to the long-term tenant farmers of the Ketteman property, petitioners William K. and Norma L. Hollingsworth (the Hollingsworths). Mrs. Ketteman also decided to convey in her will an interest in the property to her attorney, petitioner S. Preston Williams (Williams).

In March or April of 1967, Mrs. Ketteman consulted her attorneys about Eisenberg's offer to purchase the Ketteman property and about her decision to convey the property by will. Mrs. Ketteman also expressed to her attorneys a desire that the property generate an annual income that would provide her a satisfactory standard of living for the rest of her life. Mrs. Ketteman was advised to sell the Ketteman property during her lifetime in order to minimize Federal estate taxes. She also was informed by her attorneys that a sale of the property at less than its fair market value would result in a Federal gift tax liability.

Upon the advice received from the attorneys, Mrs. Ketteman formed a Missouri corporation, Ketteman Industries, Inc. (hereinafter referred to as the corporation), and sold the Ketteman property to the corporation on May 3, 1967. Incident to its formation, the corporation issued equal amounts of stock to six individuals (namely, the Reinekes, the Hollingsworths, Mr. Williams, and Mrs. Ketteman). It was Mrs. Ketteman's intent that the shareholders of the corporation other than herself, all of whom were her intended testamentary heirs, benefit from the anticipated appreciation of the Ketteman property at some time in the future when the property would be sold by the corporation to real estate developers.

As consideration for the transfer of the Ketteman property, the corporation paid Mrs. Ketteman a $480,000 promissory note. Interest accrued under the promissory note at 4 percent per year. The note was secured by the pledge of the corporation's stock. The shareholders were not personally liable for the principal or interest due under the corporation's promissory note. In determining the selling price to the corporation of the Ketteman property, Mrs.

---

[2]John M. Reineke died during the pendency of trial. His estate was substituted as a petitioner herein by order of the Court dated Oct. 24, 1983.

Ketteman relied on the opinions with respect thereto of her attorneys and of her banker. The amount of Eisenberg's offer, which had been reextended to Mrs. Ketteman sometime in the spring of 1967, also influenced her in deciding on the $480,000 selling price.

Beginning in the summer of 1967, Williams, on behalf of the corporation, negotiated with potential buyers for the sale of the Ketteman property. In August of 1967, the corporation conveyed a small corner of the property (consisting of 5.24 acres) to the Missouri Highway Commission for a total purchase price of $36,850. In December of 1967, the corporation received an offer to purchase the Ketteman property for $7,000 per acre, but the offer was rejected due to the payment terms reflected in the offer. Also in December of 1967, the corporation made an offer to sell the Ketteman property to another prospective purchaser for $7,000 per acre, but that offer was rejected. In March of 1968, the corporation sold a small, 1-acre parcel of the Ketteman property to the United Telephone Co. for $40,000.

After lengthy negotiations, in July of 1968, the shareholders of the corporation sold for $2,500,360 all of the outstanding shares of stock in the corporation to an investment partnership (hereinafter referred to as the Eisenberg group). The sale of stock essentially was equivalent to a sale of the remaining 225 acres of the Ketteman property—the corporation's only asset—at a price of approximately $11,100 per acre. Under the sales agreement, a total of $500,000 in cash was paid by the Eisenberg group to the five shareholders of the corporation ($100,000 to each shareholder). The Eisenberg group assumed the corporation's $480,000 promissory note to Mrs. Ketteman and issued six separate promissory notes of its own, one to each of the shareholders of the corporation, in the total amount of $1,570,846.30. These promissory notes were secured by a deed of trust on the Ketteman property. On August 1, 1968, the corporation was dissolved.

Although the Eisenberg group was successful in developing a portion of the Ketteman property for commercial use, the rate of commercial development of the Ketteman property that took place after the 1968 sale was far less than the rate of development Mrs. Ketteman and the other

shareholders of the corporation had anticipated as of May 3, 1967, the date the Ketteman property was transferred to the corporation. The commercial development that did occur was located on the 80 western acres of the Ketteman property that fronted I-29 to the west and 71-Bypass to the north. By 1977 (10 years later), the only building constructed on the remaining 151 acres of the Ketteman property was an industrial warehouse that was leased by the Eisenberg group. On July 5, 1977, the Eisenberg group, in lieu of allowing a foreclosure against the 130 acres of Ketteman property it still owned, deeded all 130 acres to the note holders.

Mrs. Ketteman did not file a Federal gift tax return with respect to her sale of the Ketteman property in 1967 to the corporation. Mrs. Ketteman died on December 24, 1972, and thereafter her estate filed a Federal estate tax return, and an amended return which reflected a Federal estate tax liability of $200,017.31, which was paid by the estate.

At trial, testimony and documentary evidence was introduced by, among others, two real estate appraisers concerning the fair market value of the Ketteman property on May 3, 1967.

## OPINION

### Fair Market Value of Property and Gift Tax

Section 2501,[3] in general, imposes a tax on gifts of property by an individual. If property is transferred for less than adequate and full consideration in money or money's worth, the amount by which the value of the property exceeds the value of the consideration is deemed a gift. Sec. 2512(b);[4] *Commissioner v. Wemyss*, 324 U.S. 303 (1945); *Harwood v. Commissioner*, 82 T.C. 239, 257 (1984). A

---

[3]Sec. 2501(a)(1) provides in relevant part:

SEC. 2501(a). TAXABLE TRANSFERS.—

(1) GENERAL RULE.—For the calendar year 1955 and each calendar year thereafter a tax, computed as provided in section 2502, is hereby imposed on the transfer of property by gift during such calendar year by any individual, resident or nonresident.

[4]Sec. 2512(b) provides:

(b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

transfer of property to a corporation for less than adequate and full consideration generally represents a gift by the donor to the individual shareholders of the corporation to the extent of their proportionate interests in the corporation. Sec. 25.2511–1(h)(1), Gift Tax Regs.;[5] *Kincaid v. United States*, 682 F.2d 1220, 1224 (5th Cir. 1982); *Heringer v. Commissioner*, 235 F.2d 149, 151 (9th Cir.), cert. denied 352 U.S. 927 (1956); *Estate of Hitchon v. Commissioner*, 45 T.C. 96, 103–104 (1965).

Petitioners argue that the transfer of the Ketteman property by Mrs. Ketteman to the corporation was not a gift because the $480,000 note Mrs. Ketteman received in return therefor represented full and adequate consideration. Respondent argues that the fair market value of the Ketteman property was approximately $1,265,000 on the date the property was transferred to the corporation. Therefore, respondent asserts that the promissory note issued by the corporation to Mrs. Ketteman in the amount of $480,000 did not represent adequate and full consideration and the excess of fair market value of the property over the amount of the note represented a gift by Mrs. Ketteman to the corporation for the benefit of the corporation's shareholders, who are the individual petitioners herein. Should we determine that Mrs. Ketteman transferred the Ketteman property for less than adequate and full consideration, petitioners concede their liabilities under Federal tax law and Missouri State law for any unpaid Federal gift tax, additions to tax, and interest determined to be owed by Mrs. Ketteman, limited to the value of the property each petitioner-transferee received from Mrs. Ketteman.[6]

---

[5]Sec. 25.2511–1(h)(1), Gift Tax Regs., provides in relevant part:

(h) The following are examples of transactions resulting in taxable gifts and in each case it is assumed that the transfers were not made for an adequate and full consideration in money or money's worth:

(1) * * * A transfer of property by B to a corporation generally represents gifts by B to the other individual shareholders of the corporation to the extent of their proportionate interests in the corporation. However, there may be an exception to this rule, such as a transfer made by an individual to a charitable, public, political or similar organization which may constitute a gift to the organization as a single entity, depending upon the facts and circumstances in the particular case.

[6]If it is determined that a gift was made by Mrs. Ketteman, petitioner-trusts concede they are liable as residuary legatees of Mrs. Ketteman's estate under sec. 6901(d) and under Mo. Ann. Stat. secs. 473.393 and 473.360 (Vernon 1956), for Federal gift taxes, additions to tax, and statutory interest owed by Mrs. Ketteman, limited to $302,218.79, respectively, the

Whether the note represented adequate and full consideration for the purchase of the Ketteman property depends on the fair market value of the property on May 3, 1967. The fair market value of property is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Sec. 25.2512-1, Gift Tax Regs.; *United States v. Cartwright*, 411 U.S. 546, 551 (1973). The determination of fair market value is a question of fact, and we are bound to consider all relevant facts and testimony in the record. *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), cert. denied 356 U.S. 950 (1958); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

As we have observed in the past, the valuation of property is an inexact science, and, if not settled by the parties, is capable of resolution by the courts only through "Solomon-like" pronouncements. *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *Messing v. Commissioner*, 48 T.C. 502, 512 (1967). The Court must make a determination herein, as of a precise date, of the value of real property that was located in a highly volatile real estate market. The expert testimony as to that value varies widely. It would serve no useful purpose to review our agreement or disagreement with each and every aspect of the experts' opinions. Cf. *Penn v. Commissioner*, 219 F.2d 18, 21 (9th Cir. 1955); *Messing v. Commissioner, supra* at 512. Rather, we will comment briefly on particular aspects of the experts' appraisals, and we will then explain our conclusions as to the fair market value of the Ketteman property.

Petitioners' expert witness, a real estate appraiser with experience in the Kansas City area, used the market data approach and valued the Ketteman property at a total of $550,000 on the relevant valuation date, May 3, 1967. The market data approach relies on sales of comparable properties to determine fair market value. Petitioners' expert selected, as comparables to the sale of the Ketteman

amount each petitioner-trust received under the residuary clause of Mrs. Ketteman's will.

The individual petitioners concede their liability as transferees of Mrs. Ketteman under sec. 6324(b), limited to the amount of the gift, if any, each individual petitioner received as a result of the transfer by Mrs. Ketteman of the Ketteman property to the corporation.

property, several properties that sold in 1967 and that were located near the airport and the Ketteman property. He made adjustments with respect to the sales price of each comparable to reflect differences between those properties and the Ketteman property. The adjustments related to the time of sale, the size and location of the property, and to the presence of buildings or improvements on the property.[7]

Respondent's expert witness also used the market data approach to value the Ketteman property, made adjustments thereto similar to petitioners' expert, and concluded that its fair market value on the valuation date was $1,265,000. Respondent's expert selected as comparables a number of the same properties petitioners' expert selected. The experts have major disagreements over the appropriate adjustments to the comparables. Their differences are summarized below.

*Adjustment for time.*—Petitioners' expert concluded that at certain times the properties located in close proximity to the airport appreciated at a rate of 20 to 30 percent per month, but at other times at a zero or very low rate of appreciation per month. He also concluded that the Ketteman property was in a period of slow appreciation immediately prior to and including May of 1967, and that the property entered a period of rapid appreciation after it was transferred to the corporation on May 3, 1967. He, therefore, concludes that it is not inconsistent for him to place a value on the Ketteman property of $550,000 on the valuation date, even though 15 months later the property sold for $2.5 million.

Respondent's expert compared sales and resales of five properties located near the airport and concluded that the properties appreciated at an average rate of 6 percent per month between the sales dates. Respondent's expert assumed in this regard a steady rate of appreciation, rather than appreciation that occurred in plateaus. Petitioners contend that the calculation by respondent's expert of a 6-percent average monthly appreciation rate is inaccurate. Petitioners assert that if an average appreciation rate is to be established, a correct calculation of the average apprecia-

---

[7]Petitioners' expert also used the income and cost methods to appraise the Ketteman property, but primarily as a verification of the market data approach.

tion for the comparable properties produces an average monthly appreciation rate of 9 percent.

*Adjustment for size.*—Both experts generally agree that the larger a parcel of property the lower price per acre it will command. With regard to two of his comparables, petitioners' expert concluded that a 25- to 30-percent per-acre downward adjustment was necessary because the comparables were smaller in size than the Ketteman property.

In making his adjustment for size, respondent's expert did not compare the size of specific comparables. He concluded, however, that an appropriate downward adjustment for size to the value of the comparables was between 4 and 10 percent.

*Adjustment for location.*—To determine an adjustment for differences between the location of the Ketteman property and the comparable properties, petitioners' expert focused on two comparables located respectively in the northwest and southwest quadrants of the intersection of I-29 and 71-Bypass. Both tracts sold during May of 1967, but the tract in the northwest quadrant (the Dillingham property) sold for 54 percent less than the tract in the southwest quadrant (the Miller property). Petitioners' expert concluded that the location of the Ketteman property was 50 percent more desirable than the Dillingham property in the northwest quadrant, and 50 percent less desirable than the Miller property in the southwest quadrant. Petitioners' expert therefore concluded that an adjustment of 25 to 30 percent (or one-half of the 54-percent difference in price between the two comparables) was appropriate to account for differences in location.

Respondent's expert made some adjustments to the comparables for location without setting forth the specific dollar amounts related thereto.

The appropriate adjustment for differences in location between the comparables and the Ketteman property centers on the extent to which investors were confident, as of May 3, 1967, that the main entrance to the airport would be located at 71-Bypass (adjacent to the Ketteman property), rather than as originally planned at 112th Street (south of the Ketteman property). The adjustments for location made

by petitioners' expert to the comparables are based in part on his opinion that the location of the main airport entrance was relatively uncertain until the 71-Bypass location was finally approved by State agencies on August 8, 1967, three months after the valuation date. Respondent argues that by May 3, 1967, investors were quite certain that the main airport entrance would be located at 71-Bypass.

*Adjustment for buildings and improvements.*—Petitioners' expert made minor adjustments to the comparables for buildings that were situated on the comparable properties. Respondent's expert made no adjustment for buildings, because he concluded that investors primarily would be interested in commercial development of the properties, and the farm buildings situated on the properties would be moved or demolished. Therefore, he concluded the buildings would have added little value to investors interested in property near the airport.

Respondent's expert made adjustments for differences between the comparables and the Ketteman property with respect to the availability of utilities, ingress and egress to the property, and access to I-29. Petitioners contend that any such differences are accounted for in an adjustment for location.

The Ketteman property, in May of 1967, was in transition from relatively low-value farmland to valuable commercial property. To determine its value, we must determine the extent to which the expectation of that change had influenced the market for property in close proximity to the airport as of May 3, 1967. Eisenberg's unaccepted offer in January of 1967 to purchase the Ketteman property it not conclusive evidence of the value of the land,[8] and Eisenberg's testimony with regard to that offer was not offered into evidence for that purpose. In addition, the resale of the Ketteman property in 1968 is an inappropriate basis of valuation because of our inability to determine with any degree of reliability the rate of appreciation that occurred during the 15 months between the valuation date and the 1968 resale of the property.

Both of the parties herein rely primarily on the same four comparables, each of which was proximate in both locations

---

[8] See *Estate of Brown v. Commissioner*, T.C. Memo. 1956-240.

and time of sale to the sale of the Ketteman property. In our view, few adjustments, if any, to the sales prices of those comparables are necessary, and we will rely on the sales of those four properties as the basis of our valuation. Certain facts relevant to those sales are as follows:

| Name of seller and (buyer) | Date of sale | Acreage | Selling Price per acre |
|---|---|---|---|
| Cutting (Mojet) | 12/07/66 | 78.2 | $5,627 |
| Miller (Mojet) | 3/19/67 | 68.3 | 6,000 |
| Duncan (TWA) | [9]7/26/67 | 116.0 | 5,984 |
| Young (Hutchinson) | 5/15/67 | 242.0 | 1,095 |

The Cutting property and the Miller property were adjacent tracts in the southwest quadrant of the intersection of I-29 and 71-Bypass. The Cutting property fronts 71-Bypass on the north, the Miller property on the east, and the airport on the west. The Miller property fronts 71-Bypass on the North, I-29 on the east, the Cutting property on the west, and the Ketteman property is directly east across I-29. The Miller property has a similar amount of I-29 frontage as the Ketteman property.

Within a few months before and after May of 1967, significant buyer interest was evident in all property immediately south of 71-Bypass and adjacent to the intersection of 71-Bypass and I-29. The Cutting and Miller properties were sold respectively in December of 1966 and March of 1967. An option to purchase the Duncan property was entered into in July of 1967. In August of 1967, five acres of the Ketteman property were sold and in March of 1968 one acre of the Ketteman property was sold at a premium price of $40,000. A total of 262 acres were involved in the Cutting, Miller, and Duncan transactions. The sales prices reflected by those transactions were based on the potential for commercial development of the properties. This potential, of course, was a result of the decision to locate the main entrance of the airport at the intersection of I-29 and 71-Bypass, which was adjacent to those properties. This evidence leads us to conclude that, as of May 3, 1967,

---

[9]July 26, 1967, is the date on which the Duncan property was optioned for sale, which effectively set the sales price.

significant interest existed in the purchase of the Ketteman property for commercial development.

The more difficult question concerns the extent to which the potential for commerical development of the Ketteman property in May of 1967 extended to the western 151 acres of the Ketteman property, as respondent contends, or to only the western 80 acres thereof, as petitioners contend. We conclude that, as of May 3, 1967, the western 100 acres of the Ketteman property should be valued as land suitable and likely to be developed as commercial property. This conclusion is based on the size of the Cutting and Miller properties (78.2 and 68.3 acres, respectively) and on the size of the Duncan property (116 acres). The fact that the 116-acre Duncan property was optioned just 2 months after May of 1967, indicates that a prospective buyer, as of May 3, 1967, was willing to purchase property in excess of 100 acres and to pay a price therefore apparently reflecting future commerical development.

The experts agree that the portion of the Ketteman property that was not suitable for commercial development is to be valued as farmland. Having concluded above that the western 100 acres of the Ketteman property should be valued as property suitable for commercial development, the remaining 131 acres are to be valued as farmland. We now proceed to determine the per-acre value, as of May 3, 1967, of the 100 acres held for commercial development and of the 131 acres held as farmland.

The commercial 100 acres can best be valued based upon the average of the per-acre prices at which the Cutting, Miller, and Duncan properties were sold. That average price was $5,870 per acre.[10] We consider the 3 properties used to compute this average sufficiently comparable to each other and to the 100 acres of the Ketteman property that were suitable for commercial development so that no adjustments are necessary to this average per-acre price for time, size, location, and buildings or improvements.

---

[10]Price breakdown was as follows:

| | |
|---|---|
| Cutting property ........ | $5,627 per acre |
| Miller property .......... | 6,000 per acre |
| Duncan property ........ | 5,984 per acre |
| | 17,611 divided by 3 equals $5,870.33 |

The 131 acres of the Ketteman property that are to be valued as farmland can best be valued based upon the average per-acre price at which the "Young" property was sold in May of 1967. Both parties agree that all of the 242 acres involved in that sale were sold as farmland. The sale occurred in the same month as the relevant valuation date, and the Young property is located relatively close to the Ketteman property. The per-acre price of the Young property in connection with the May 1967 sale thereof was $1,095. Both experts made a minor downward adjustment to that value based on buildings located on the Young property, and agreed that the per-acre value thereof without the buildings was $1,062. We will utilize that amount for the per acre value of the portion of the Ketteman property that is to be valued as farmland.

In summary, our valuation of the Ketteman property is as follows:

| | | |
|---|---|---|
| 100 acres of commercial property @ $5,870 per acre | = | $587,000 |
| 131 acres of farmland @ $1,062 per acre | = | 139,122 |
| Fair market value on May 3, 1967 | | 726,122 |

We therefore conclude that Mrs. Ketteman made a gift to the corporation in the amount of $246,122, which represents the excess of the fair market value of the Ketteman property over the amount of the promissory note receivable by Mrs. Ketteman in consideration therefor ($726,122 minus $480,000 equals $246,122). Because Mrs. Ketterman was one of the six shareholders of the corporation, the amount of her 1967 taxable gift is $205,101 ($246,122 times five-sixths equals $205,101).

### Availability of $30,000 Lifetime Exemption

Petitioners argue that they may elect to apply the $30,000 lifetime exemption from taxable gifts, provided in section 2521 (the exemption amount applicable to gifts made in 1967), to reduce the Federal gift tax deficiency determined herein for 1967.[11] Petitioners acknowledge that

[11]SEC. 2521. SPECIFIC EXEMPTION. [Repealed with respect to gifts made after December 31, 1976.]

In computing taxable gifts for the calendar year, there shall be allowed a deduction in the case of a citizen or resident an exemption of $30,000, less the aggregate of the amounts

Mrs. Ketteman elected to apply the full amount of the exemption to reduce taxable gifts she made in 1972. Petitioners contend, however, that they now are entitled to change the application of the exemption from 1972 to reduce any taxable gift determined herein for 1967.

Respondent argues that Mrs. Ketteman's Federal gift tax liabilities for 1972 are not at issue herein, and respondent notes that the statute of limitations for Mrs. Ketteman's 1972 Federal gift tax liability has long since passed. Therefore, respondent contends that if we allow petitioners to apply the $30,000 lifetime exemption to reduce the taxable gifts for 1967, we effectively would grant Mrs. Ketteman a double exemption. We agree with respondent.

Once a taxpayer has utilized the lifetime exemption, no further exemption is allowed. *Myer v. Commissioner*, 2 T.C. 291, 296 (1943), affd. per curiam 149 F.2d 642 (8th Cir. 1945). Petitioners' reliance in this regard on *Crellin v. Commissioner*, 46 B.T.A. 1152 (1942), and *Richardson v. Commissioner*, 39 B.T.A. 927 (1939), affd. on this issue and revd. on other issues 126 F.2d 562 (2d Cir. 1942), is misplaced. In *Crellin*, the Board of Tax Appeals allowed a taxpayer the lifetime exemption with respect to gifts made in the year in dispute because the taxpayer mistakenly had not claimed the exemption with respect to gifts made in prior years. See *Damner v. Commissioner*, 3 T.C. 638, 643 (1944). In *Richardson*, although the Board allowed the taxpayer to change the use of the lifetime exemption from 1934 to 1932 and to recompute Federal gift tax liabilities for 1934, the taxpayer's gift tax liability for 1932 and 1934 both were open and before the Board. *Richardson v. Commissioner, supra*, 39 B.T.A. at 936.

### Availability of $3,000 Annual Per Donee Exclusion

Petitioners contend that the amount of any taxable gift Mrs. Ketteman is determined to have made in 1967 with respect to her transfer of the Ketteman property should be reduced by $3,000 for each shareholder of the corporation

---

claimed and allowed as specific exemption in the computation of gift taxes for the calendar year 1932 and all calendar years intervening between that calendar year and the calendar year for which the tax is being computed under the laws applicable to such years.

other than Mrs. Ketteman, based upon the annual per donee exclusion from Federal gift tax liability for gifts made in 1967. See sec. 2503(b). Respondent argues that the annual exclusion is not available herein because gifts to corporations are treated as gifts to the shareholders thereof and constitute gifts of future interests, which by statute are not eligible for the annual per donee exclusion. Sec. 2503(b).

As in effect in 1967, section 2503(b)[12] permitted an exclusion from taxable gifts in the amount of $3,000 per donee per year. The exclusion applies, however, only to gifts other than gifts of future interests in property. The definition of "future interests" includes "reversions, remainders, and other interests or estates, whether vested or contingent, * * * which are limited to commence in use, possession, or enjoyment at some future date or time." Sec. 25.2503-3(a), Gift Tax Regs.; *French v. Commissioner*, 138 F.2d 254, 257 (8th Cir. 1943). Respondent argues that a shareholder's use, possession, or enjoyment of property transferred to a corporation is contingent and represents a future interest for which the annual gift tax exclusion is not allowable.

Petitioners contend that the shareholder-donees of the corporation, the individual petitioners herein, had the requisite possession and present use of the Ketteman property because they comprised the entire membership of the board of directors of the corporation. Petitioners assert that in that capacity they could have authorized a corporate dividend or a distribution in liquidation of the corporation and thereby could have enjoyed the present use of the property.

The Eighth Circuit explained in *French v. Commissioner, supra*—

Unless the donee is entitled unconditionally to the present use, possession, or enjoyment of the property transferred, the gift is one of a future interest for which no exclusion is allowable under the statute. [138 F.2d at 257.]

---

[12]SEC. 2503. TAXABLE GIFTS.

(b) EXCLUSION FROM GIFTS.—In the case of gifts (other than gifts of future interesets inproperty) made to any person by the donor during the calendar year 1955 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. * * *

In *Fondren v. Commissioner*, 324 U.S. 18, 20 (1945), the Supreme Court stated that in order to qualify for the exclusion the donee "must have the right presently to use, possess or enjoy the property."

In *Chanin v. United States*, 393 F.2d 972 (Ct. Cl. 1968), stock of a closely held corporation was given to another closely held corporation. In finding that the shareholders of the second corporation received gifts of future interests, the Court of Claims explained—

a stockholder-donee could use, possess or enjoy such stock only upon a liquidation of [the corporation] or a declaration of a * * * dividend in kind, the first of which usually requires joint action of a majority of the stockholders and both of which require joint action of the corporation's cirectors. [393 F.2d at 976.]

With respect to this issue, we find no material differences between this case and *Heringer v. Commissioner*, 235 F.2d 149 (9th Cir. 1956), modifying 21 T.C. 607 (1954). In *Heringer*, four related individuals donated a tract of farmland to their closely held family corporation, of which all the remaining shareholders were their respective children. The Ninth Circuit denied the donors the annual gift tax exclusion on the grounds that the—

"Shareholders of the corporation could possess or enjoy the land or income derived therefrom only upon declaration of dividends, an act which required the joint action of members of the competent corporate body and which no single shareholder could perform." [*Heringer v. Commissioner*, 235 F.2d at 152.][13]

We agree with respondent that the shareholders of the corporation received an interest in the Ketteman property that was too contingent to be considered a present interest

---

[13]Both parties herein agree that the gift by Mrs. Ketteman to the corporation should be regarded as a gift to the shareholders of the corporation. See sec. 25.2511-1(h)(1). Cf. *Thompson v. Commissioner*, 42 B.T.A. 121 (1940). The treatises that have addressed this issue uniformly acknowledge that a gift to a corporation for Federal gift tax purposes generally will be treated as a gift to the shareholders of the corporation and that the annual per donee gift tax exclusion will not apply since such gifts constitute gifts of future interests to the shareholders of the corporation. See B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 124.3.1, at 124-4 (1984); R. Stephens, G. Maxfield & S. Lind, Federal Estate and Gift Taxation, par. 9.04[1][b] at 9-13 (5th ed. 1983); E. Fiore, M. Friedlich, T. McInerney & A. Chevat, Modern Estate Planning, sec. 4.08[2], at 4-47 (1985); H. Dubroff & D. Kahn, Federal Taxation of Estates, Gifts & Trusts, par. 21.6(c), at 341 (1980); F. Gerhart, The Gift Tax, Practising Law Institute 16-17, 138-139 (1980).

for purposes of section 2503(b). We therefore deny petitioners' claim that the amount of Mrs. Ketteman's taxable gift should be reduced by the $3,000 per donee annual gift tax exclusion.

### Failure To File Addition to Tax

Respondent determined an addition to tax in the amount of $37,435.94 under section 6651(a)(1) for failure to file a Federal gift tax return.[14] Respondent contends that Mrs. Ketteman's failure to file a Federal gift tax return was due to willful neglect in that it was part of an overall plan to avoid payment of Federal gift and estate taxes with respect to her transfer of the Ketteman property.

Petitioners argue that Mrs. Ketteman's failure to file was due to reasonable cause in that she relied on her attorneys' advice that a transfer of the Ketteman property to the corporation for an amount equal to its fair market value would incur no Federal gift tax liability. Integral to petitioners' argument is their contention that Mrs. Ketteman believed that the fair market value of the property was $480,000 on the date it was transferred to the corporation. Reasonable cause exists if a taxpayer exercised ordinary business care and prudence. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; Estate of Kerber v. United States, 717 F.2d 454, 455 (8th Cir. 1983).

In 1967, Mrs. Ketteman relied on the advice of her attorneys that if the Ketteman property was transferred to the corporation for its fair market value, no liability for Federal gift tax would result. Cf. Coldwater Seafood Corp. v. Commissioner, 69 T.C. 966, 974 (1978); Estate of Hundley v. Commissioner, 52 T.C. 495, 514 (1969), affd. per curium 435 F.2d 1311 (4th Cir. 1971). Mrs. Ketteman, also, made a reasonable effort to determine the value of the property by consulting with a local banker who was familiar with the

---

[14]SEC. 6651. FAILURE TO FILE TAX RETURN.

(a) ADDITION TO THE TAX.—In case of failure—

(1) to file any return * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

Ketteman property. In light of the advice received from her attorneys, from the banker, and the offer made by Eisenberg in January of 1967, and in light of the fact that the $480,000 price placed on the property by Mrs. Ketteman in the May 1967 transaction was roughly double the price for which other nearby farm property had sold during May of 1967, we think that Mrs. Ketteman was justified in believing that no gift was made. Cf. *Estate of Reynolds v. Commissioner*, 55 T.C. 172, 203 (1970). We conclude that Mrs. Ketteman's failure to file was due to reasonable cause and not willful neglect.

## Other Issues

Petitioners advance the additional argument that had Mrs. Ketteman realized that her transfer of the Ketteman property to the corporation constituted a gift, she would have filed a Federal gift tax return reporting the gift, and she would have paid the Federal gift tax determined by respondent with respect thereto. Therefore, petitioners contend, the payment of Federal gift taxes that would have been made by Mrs. Ketteman would have reduced the value of her taxable estate and correspondingly would have reduced her Federal estate tax liability. Petitioners argue that they now should be entitled to offset any Federal gift tax deficiency determined herein by the amount by which Mrs. Ketteman's Federal estate tax liability would have been reduced had the full gift tax liability been paid at the time the gifts were made. In addition, petitioners contend that if Mrs. Ketteman had paid the full gift tax liability when she transferred the property, petitioners' bases in their stock of the corporation would have been higher when they sold that stock to the Eisenberg group, and they would have reported less capital gain with regard to the sale of the stock.

Because the applicable statutes of limitation now prevent the estate of Mrs. Ketteman and petitioners herein from obtaining refunds of the Federal estate and income taxes which would not have been paid if the estate and petitioners had realized that a taxable gift had been made by Mrs. Ketteman in 1967, petitioners now seek to offset to reduce any Federal gift tax deficiency determined herein by the

amount of overpaid Federal estate and income taxes. Petitioners rely generally on principles of mitigation of the statutes of limitation and estoppel. The mitigation provisions of sections 1311 through 1314, however, are not applicable to determinations affecting Federal gift taxes. See the "circumstances of adjustment" set forth in sec. 1312 and sec. 1.1311(a)–2(b), Income Tax Regs.

Petitioners' estoppel argument also is without merit. Any error in the Federal estate and income taxes paid by the estate or by petitioners is not attributable to any acts of respondent's representatives, but simply to the manner in which the estate and petitioners reported the transactions in question on their respective Federal tax returns and to the running of the statutes of limitations with respect thereto. See *Piarulle v. Commissioner*, 80 T.C. 1035, 1044 (1983), for a discussion of the circumstances in which estoppel may apply. As explained, we reject petitioners' arguments based on mitigation of the statutes of limitation and estoppel.

Due to concessions,

*Decision will be entered under Rule 155.*