PAUL C. HARDING AND AUDREY T. HARDING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harding v. Commissioner
Docket Nos. 22157-92, 2150-93
United States Tax Court
T.C. Memo 1995-216; 1995 Tax Ct. Memo LEXIS 218; 69 T.C.M. (CCH) 2625; May 18, 1995, Filed *218 Decisions will be entered for respondent. For petitioners: Robert L. Harding. For respondent: James F. Kearney. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in these consolidated cases, determined Federal income tax deficiencies in the amounts of $ 15,312 and $ 6,997 for 1987 and 1988, respectively. Respondent also determined additions to tax for 1987 under section 6653(a)(1)(A)[1] in the amount of $ 766 and for 1988 under section 6653(a)(1) in the amount of $ 350; and for 1987 and 1988 under section 6659 in the amounts of $ 1,559 and $ 2,099, respectively. Additional interest under section 6621(c) and an addition to tax under 6653(a)(1)(B) were determined to apply to $ 5,196 of the 1987 income tax deficiency. Additional interest under section 6621(c) was determined to apply to the entire 1988 income tax deficiency. The issues for our consideration are: (1) Whether petitioners donated an oil and gas partnership interest to a qualified charitable organization during 1986; (2) if donated, whether the fair market value of the interest was of a sufficient amount to permit petitioners to be entitled to charitable contribution carryovers from *219 1986 to 1987 and 1988; and (3) whether petitioners are liable for the above-mentioned additions to tax and additional interest. FINDINGS OF FACT [2]
Petitioners, who were at all pertinent times husband and wife, resided in New Smyrna Beach, Florida, at the time their petitions in these cases were filed. During December 1980, petitioners paid $ 20,000 for a one-twenty-ninth interest in Washington County Oil & Gas, Ltd., a Florida limited partnership (Partnership). The private placement memorandum concerning Partnership, among other matters, notified investors *220 that the attorney rendering the tax opinion was also counsel to the general partner, and that the attorney's fee was not set at arm's length. The private placement memorandum contained an explanation of the alleged tax benefits associated with an ownership interest in Partnership, including the deduction of intangible drilling and development costs, the deduction of dry hole costs, and depletion allowances in connection with any income from production. Under the proposed development plan, petitioners' $ 20,000 investment would generate deductions against their ordinary income from other sources as of the time of investment. Partnership owned an interest in three oil wells located in Washington County, Ohio. Partnership's general partner was Charles H. Vodicka (Vodicka); it was operated by Petro Oil & Gas Corp. (Petro) (a Delaware corporation with limited net worth and limited experience as an oil and gas operator). Sandhill Energy, Inc. (Sandhill), was the subcontractor of Petro, and it also subleased drilling sites to Partnership. In 1987, Sandhill filed for bankruptcy. Petitioners, through the promoter of their partnership interest, became aware of an opportunity to contribute *221 their one-twenty-ninth interest to a section 501(c)(3) charitable organization. Petitioners neither were familiar nor had prior association with the section 501(c)(3) organization. During December 1986, petitioners completed the documentation to cause their one-twenty-ninth interest to be transferred to the section 501(c)(3) organization. In an amended 1986 Federal income tax return, petitioners reported a charitable deduction of $ 108,043 attributable to the donation of their one-twenty-ninth interest in Partnership. The amount claimed was based on an appraisal obtained through Partnership and the promoter prior to the filing of the 1986 amended return, but after the donation was made and the original 1986 return was filed. Due to a maximum contribution deduction limited to 30 percent of adjusted gross income, only $ 61,955 was claimed for 1986, and petitioners claimed contribution carryovers in the amounts of $ 21,338 and $ 24,750 to their 1987 and 1988 taxable years, respectively. Petitioners' 1986 return, in addition to the $ 108,043 contribution of the partnership interest, reflects other property contributions of $ 300 and cash contributions of $ 950. Likewise, petitioners' *222 1988 return, in addition to the $ 24,750 carryover, reflects property contributions of $ 100 and cash contributions of $ 657. Subsequent to filing their 1986 income tax return, petitioners, through their son, an attorney, inquired in a July 1, 1987, letter about the oil reserves in the contributed property and about the appraisers' credentials. In a July 6, 1987, response, Vodicka advised that reserve estimates had been performed by a Dr. Chase, who was chairman of the petroleum engineering department of Marietta College, and that he would be glad to provide a recent curriculum vitae. Petitioners were also told in that letter that Dr. Chase was independent from Partnership and that his letter regarding the oil and gas reserves could be obtained from Petro-Analysis, Inc. The private placement memorandum, however, stated that Dr. Chase was not independent from Partnership and that his relationship with Partnership was one of the risk factors involved in investing. Petitioners relied on an opinion by Dr. Hunter Herron for the value placed on the donated interest. Dr. Herron's opinion, in turn, relied on Dr. Chase's reserve estimates. In a letter dated July 11, 1986, Dr. Chase *223 provided an estimate of the reserves in the three Partnership properties. Dr. Chase's letter contained the following caveats: (1) "the reserves * * * computed in this study are, at best, approximations of the volumes of oil and gas which may exist"; (2) "Production data was not made available * * * for this study"; (3) "production decline curves and subsequent recoverable reserve calculations which are judged to be more accurate than volumetric reserve calculations could not be made"; (4) the logs used as a base for the estimates are not constantly reliable, and readings from different tools and the process of gathering and interpreting the information is subjective; and (5) Dr. Chase did not know the pressure within the various well zones. The general partner opined in the private placement memorandum that, due to certain geological features and the closeness of the well sites, the oil-bearing formations should be considered "semi-developmental", and that adjoining wells could have significantly different results. Statistical data was gathered by others, and Dr. Chase needed to make assumptions in order to estimate formation thickness, porosity, and oil and gas saturations. Dr. *224 Chase also noted that his assumptions could be materially affected if, e.g., other well logs in the vicinity did not remain constant. Dr. Chase thus pointed out that it "is critical to appreciate the inaccuracies which may be inherent in volumetric reserve calculations due to this assumption [regarding other wells in the same field or vicinity of the subject wells]." Dr. Chase also included an extensive disclaimer about the accuracy of the data underlying his estimations and renounced any possible liability due to errors in his estimations. Dr. Herron found Partnership's three wells to have a total value of $ 3,714,600, based on Dr. Chase's reserve estimates. Thus, petitioner's one-twenty-ninth interest was estimated to have a $ 108,000 [3] value. Those values were reached by first estimating future revenue on Dr. Chase's reserve estimates. Then Dr. Herron applied a 10-percent discount factor to reach the future interest, which was further reduced by a 25-percent business risk factor. (The 25-percent risk factor was used because the well had no production history.) Dr. Herron's estimate was also reduced by any royalty payments. Dr. Herron signed petitioners' 1986 Form 8283, *225 which contained information about the claimed partnership interest contribution. Dr. Herron's report was purely hypothetical and dependent solely on the accuracy of Dr. Chase's reserve estimates. Dr. Chase had used the "volumetric method" to estimate the reserves. The volumetric method relies on electronic sampling and the extrapolation of the possible universe of reserves. Dr. Chase did not testify. Moreover, no information was provided to establish the accuracy of his estimates. Dr. Herron knew that there had been limited production from the wells; however, he did not use this information in reaching his valuation opinion. The placement memorandum indicated that drilling sites were obtained without warranty of title and that losses might arise from title defects in assignment rights. Partnership's production revenue was burdened by a 25-percent royalty and a 20-percent working interest. *226 Partnership's general partner had no experience in oil and gas operations. Possible defaults may have existed with respect to two of the leases because drilling may not have begun within the lease's required 45 days. Partnership filed tax returns with the State of Ohio reporting (for the three leases) 17 and 121.1 barrels of oil production for 1981 and 1982, respectively. Partnership also reported 523.20 and 1,915.90 cubic feet of gas production for 1981 and 1982, respectively. No oil or gas was produced after December 31, 1982. In fact, there is no indication that any activity took place after the limited production in 1982. Furthermore, at the time of petitioners' donation, both unpaid debt and mechanics' liens dating back to 1983 and exceeding $ 100,000 encumbered the leased property. OPINION The parties have analyzed petitioners' claimed contribution from two perspectives. First, respondent focuses on the bona fides of the transaction by questioning whether petitioners possessed an interest to contribute and, if petitioners possessed such an interest, whether it was actually transferred to a section 501(c)(3) organization. Second, respondent contends that the value *227 of petitioners' interest was insufficient to generate the contribution carryovers to 1987 and 1988. If respondent's position is sustained on either ground, then petitioners' claimed deduction must fail. We first consider the question of value. Section 170(a) provides taxpayers with a charitable deduction for contributions to organizations described in section 170(c). The parties agree that the intended donee organization was one that fits within the requirements of section 170(c) (i.e., it is a section 501(c)(3) organization). Section 1.170A-1(c)(1), Income Tax Regs., requires that the amount of a contribution in property be determined by its fair market value at the time of the donation. Regarding the allowance for depletion, section 1.611-2(d)(1) and (2), Income Tax Regs., focuses on the determination of the fair market value of mineral interests. That section provides: d) Determination of fair market value of mineral properties, and improvement, if any. -- (1) If the fair market value of the mineral property and improvements at a specified date is to be determined for the purpose of ascertaining the basis, such value must be determined, subject to approval or revision by *228 the district director, by the owner of such property and improvements in the light of the conditions and circumstances known at that date, regardless of later discoveries or developments or subsequent improvements in methods of extraction and treatment of the mineral product. The district director will give due weight and consideration to any and all factors and evidence having a bearing on the market value, such as cost, actual sales and transfers of similar properties and improvements, bona fide offers, market value of stock or shares, royalties and rentals, valuation for local or State taxation, partnership accountings, records of litigation in which the value of the property and improvements was in question, the amount at which the property and improvements may have been inventoried or appraised in probate or similar proceedings, and disinterested appraisals by approved methods. (2) If the fair market value must be ascertained as of a certain date, analytical appraisal methods of valuation, such as the present value method will not be used: (i) If the value of a mineral property and improvements, if any, can be determined upon the basis of cost or comparative values and replacement *229 value of equipment, or (ii) If the fair market value can reasonably be determined by any other method. "[F]air market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value is a question of fact, and it is determined by examining the entire record. Skripak v. Commissioner, 84 T.C. 285, 320 (1985). From a judicial perspective, valuation questions are both factual and judgmental. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347; CTUW Georgia Ketteman Hollingsworth v. Commissioner, 86 T.C. 91, 98 (1986); Buffalo Tool & Die Manufacturing. Co. v. Commissioner, 74 T.C. 441, 452 (1980). In 1980, petitioners paid $ 20,000 for a one-twenty-ninth interest in Partnership, which owned three oil and gas properties. Partnership was a typical tax-shelter investment prevalent during the early 1980's. *230 The taxpayers attempted to immediately deduct multiples of the investment against their ordinary income from other sources. After the deductions had reduced their tax basis and/or their amount at risk, the potential for recapture or for the gain on the disposition of the interest became a problem. Petitioners had reached that point. There was no income earned in any year. Moreover, limited production was reported for 1981 and 1982, and no production was reported in any year thereafter. [4] In late 1986, the shelter promoter advised petitioners how they could contribute their partnership interest to a charitable entity in order to obtain tax benefits. The attempted contribution would also serve to avoid the fate of most burned-out shelter investments (i.e., gain on their disposition). Petitioners were also motivated to donate their interest by the fact that, through the promoters, petitioners' interest was valued at $ 108,000. At the pertinent times, Partnership was essentially dormant. No deductions were currently available to petitioners, and no income had ever been realized. Hence, we find it unlikely that petitioners' one-twenty-ninth interest (acquired for $ 20,000) was *231 worth $ 108,000. We also note that the promoters placed a high value on the partnership interest shortly before the operating subcontractor (the only one with expertise in the oil and gas business) petitioned into bankruptcy. Petitioners' experts seek to magnify the value of the partnership interest by using a purely theoretical approach. This attempt must fail. Petitioners argue that Hightower v. Commissioner, T.C. Memo. 1972-252, presented this Court with a similar factual situation in which the taxpayer contributed an oil and gas interest from an unproductive concern. Petitioners also stress that the Court approved a valuation method that used estimates of future production based on estimates of reserves. This method also applied an interest discount and other factors in reaching a value. In Hightower, this Court accepted and modified estimates *232 of oil and gas reserves. The Court explained that the estimated reserves were a reasonable reflection of "the volume of gas to use as a starting point in determining the fair market value of the wells." It is clear that the Court was satisfied with the record and supporting data. In the instant case, Dr. Chase furnished an estimate of the reserves in the three properties held by Partnership through a letter dated July 11, 1986. Dr. Chase's letter contained numerous caveats: (1) "the reserves * * * computed in this study are, at best, approximations of the volumes of oil and gas which may exist"; (2) "Production data was not made available * * * for this study"; (3) "production decline curves and subsequent recoverable reserve calculations which are judged to be more accurate than volumetric reserve calculations could not be made"; (4) the logs used as a base for the estimates are not constantly reliable; (5) readings from different tools and the process of gathering and interpreting the information is subjective; and (6) additionally, the pressure within the various well zones was unknown to Dr. Chase. The statistical data regarding the wells was apparently not gathered by Dr. *233 Chase. He had to make assumptions and estimate formation thickness, porosity, and oil and gas saturations. Dr. Chase also noted that his assumptions could be materially affected if, for instance, well logs (of other wells in the vicinity) did not remain constant. Dr. Chase pointed out that it "is critical to appreciate the inaccuracies which may be inherent in volumetric reserve calculations due to this assumption [regarding other wells in the same field or vicinity of the subject wells]." Dr. Chase also included an extensive disclaimer regarding the accuracy of the underlying data and any liability for the failure of his estimate to measure up to reality. We find Dr. Chase's estimates to be, at best, poorly grounded, without substance, and unconvincing. [5]
*234 Petitioners purchased their partnership interest for $ 20,000. There was little, if any, activity or income. Hence, we are unwilling to rely on a purely theoretical estimate of value. Respondent notes that, if the wells produced at the same rate as reflected in the 1982 Ohio reports, it would have taken over 400 years to consume the projected reserves in Dr. Chase's report. Petitioners offered no comparative or actual selling prices of Partnership oil and gas interests. Alternative valuation methods or estimates were not considered by either Dr. Chase or Dr. Herron. No explanation was provided for their resorting to a theoretical method. Considering the circumstances here, we refuse to rely on the valuation offered by petitioners. Consequently, petitioners have not shown that their one-twenty-ninth interest in Partnership was worth an amount that would have exceeded $ 61,955, and, thus, cause the contribution carryovers from 1986 to the 1987 and 1988 tax years. Accordingly, petitioner is not entitled to any contribution deduction attributable to Partnership for 1987 or 1988. Because we have decided that petitioners have not proven a sufficient value to cause a charitable *235 contribution carryover to 1987 and 1988, it is unnecessary to decide the "bona fides" issues raised by respondent. Finally, we consider the additions to tax determined by respondent. Respondent determined that petitioners are liable for the valuation overstatement addition pursuant to section 6659. Under that section a valuation overstatement results if the value claimed is more than 150 percent of the correct value. Our finding that petitioners failed to show a value in excess of the 1986 threshold of $ 61,955 insures that the value claimed is more than 150 percent of the correct value. [6] The addition applicable for valuation overstatements in the case of charitable contributions is 30 percent. Sec. 6659(f)(1). *236 Respondent may waive the contribution valuation overstatement addition where (1) the claimed value was based on a qualified appraisal made by a qualified appraiser, and (2) the taxpayer made a good faith investigation of the value of the contributed property. Sec. 6659(f)(2)(A) and (B). The record appears to support a finding that Drs. Chase and Herron were qualified appraisers. But the weaknesses we have found, and the caveats and conditions expressed, cause the appraisal petitioners relied on to fall far short of being "qualified" within the meaning of section 6659(f)(2). The requirements for a "qualified appraisal" for purposes of section 6659(f) are set forth in the regulations under section 170. Subdivision (ii)(I) of section 1.170A-13(c)(3), Income Tax Regs., provides that the fair market value of the contributed property meet the requirements of section 1.170A-1(c)(2), Income Tax Regs. That section defines fair market value as: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * The appraisal used by petitioners *237 to support their claimed contribution was purely hypothetical, and it was not based on the appraisers' personal knowledge. This appraisal, at best, was the maximum conceivable estimate value for petitioners' partnership interest. It is obvious that it did not take into account the extant realities or a price that a willing buyer and a willing seller would have paid for the partnership interest (which had an insignificant production record and no proven propensity to produce). We also note that the longstanding mechanics' liens against the properties were not accounted for in the appraisers' reports. We are not surprised that the appraisers did not reference any specific sales or purchases, even though the three wells that Partnership owned are part of a larger collection of wells. Such information would likely have shown that the partnership interest was not worth anything near what Dr. Herron calculated. Petitioners did inquire about the source and nature of the reserves, after the donation and filing of their original 1986 return. However, we cannot say that this would have been a sufficient inquiry under the circumstances. Petitioners did not ask about comparable sales *238 of other wells or partnership interests. This would have shown petitioners that the estimates and appraisers' hypothesis were out of line. Petitioners invested $ 20,000, and they received no income while holding the property (about 6 years). Thus, petitioners should have been at least somewhat skeptical about whether their partnership interest was then worth $ 108,000. We find that the appraisal petitioners relied on was not qualified within the meaning of section 6659(f). Accordingly, respondent did not err in determining a 30-percent addition to tax for a valuation overstatement each year at issue. Respondent also determined a 5-percent addition to tax in each year for negligence or intentional disregard of rules or regulations under section 6653(a). Section 6653(a)(1)(A) for 1987 and section 6653(a)(1) for 1988 provide for a 5-percent addition to tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. If section 6653(a)(1)(A) applies for 1987 then section 6653(a)(1)(B) provides for a further addition to tax equal to 50 percent of the interest attributable to that portion of the underpayment resulting from negligence or intentional *239 disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioners bear the burden of showing that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners' relatively unquestioning reliance on the appraisers was not reasonable under the circumstances, and it results in their negligence within the meaning of section 6653(a). Although petitioners did inquire about their appraisal and the reliability of the appraisers, the response that they received from Partnership was, at best, indistinct. Petitioners were advised that Dr. Chase was independent, although the private placement memorandum stated otherwise. Petitioners were eventually referred to other possible sources to determine the reliability of the appraisal or reserves and to review the appraisers' qualifications. There is no indication that petitioners made any further inquiry or that they sought any information supporting the valuation. Considering *240 their $ 20,000 investment, Partnership's lack of income or income prospects, and the lack of facts with which to support the $ 108,000 claimed value, petitioners were not reasonable in their reliance on the valuation, appraisal, or statement of the reserves presented to them. Moreover, we note that petitioners did not show any pattern of past charitable giving commensurate with the relatively large amounts involved in this case. Other than the $ 108,043 amount claimed for the partnership interest, petitioners' giving pattern does not comport with the controverted amounts in issue. Even more telling is petitioners' lack of information or involvement with the donee/charitable organization. We accordingly find that respondent did not err in determining additions for 1987 under section 6653(a)(1)(A) and (B), and for 1988 under section 6653(a)(1). Respondent determined that petitioners were liable for additional interest under section 6621(c) for 1987 and 1988. Section 6621(c) provides for interest at 120 percent of the normal rate on substantial understatements attributable to tax-motivated transactions. Section 6621(c)(3)(A)(i) defines a tax-motivated transaction to include valuation *241 overstatements within the meaning of section 6659(c). Our finding that such valuation overstatements under section 6659 occurred here causes section 6621(c) to apply with respect to both taxable years. Hence, respondent's determination of this additional interest is sustained. To reflect the foregoing, Decisions will be entered for respondent.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties' stipulation of facts, along with attached exhibits are incorporated by this reference.↩
3. Although $ 108,000 is somewhat less than one-twenty-ninth of $ 3,714,600, we accept the parties' stipulations on this matter.↩
4. This limited production was considered insufficient by petitioners' experts to project the value or profitability of the properties.↩
5. See also Osterhout v. Commissioner, T.C. Memo. 1993-251, describing the volumetric method as follows: We are not convinced of the accuracy of the geology reports relied upon by petitioners. In calculating the reserve estimates of the Balboa and Drake prospects, the geologists resolved every doubt in favor of the maximum possible reserves, assumed every well would be drilled, and utilized a method of valuation that was known to be characteristically high but not particularly accurate. Rather than utilizing independent data in determining the amount of the reserves, the geologists used assumptions provided by the sublessors, and, in fact, the reports were commissioned by the sublessors. Moreover, Osterhout ignored the significantly lower oil reserve estimates and price assumptions contained in the independent report pertaining to the Drake prospect prepared by Coopers & Lybrand. With respect to Balboa, Osterhout never received an independent determination as to the viability of the program.↩
6. Petitioners claimed $ 108,043 as the value. They failed to show that the value exceeded $ 61,955. Even if petitioners had proven that the value was $ 61,955 (i.e., the threshold after which carryover to 1987 or 1988 would occur), the valuation overstatement would be at least 174 percent of actual value.↩